1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES  DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| SCOTT MILLER, an individual, on behalf of himself, the general public and those similarly situated, | No. C 12-04936 LB |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS FOR PRODUCTS PLAINTIFF DID NOT PURCHASE** |
| v. | |
| GHIRARDELLI CHOCOLATE COMPANY, and DOES 1 THROUGH 50, | [ECF No. 27] |
| Defendants. | |

_____/

**INTRODUCTION**

Plaintiff Scott Miller bought a package of "Ghirardelli® Chocolate Premium Baking Chips – Classic White" and then – on behalf of himself and other consumers – sued the Ghirardelli Chocolate Company, complaining that Ghirardelli deceived customers into thinking that this and four other products contained chocolate when they did not contain chocolate, white chocolate, or cocoa derivatives and instead were "artificial" or "imitation," in violation of United States Food and Drug Administration ("FDA") and state regulations.  First Amended Complaint ("FAC"), ECF No. 24, ¶ 2.[1]  His four claims assert violations of the following: (1) the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750 *et seq.*; (2) the False Advertising Law, Cal. Bus. & Prof.

_____

[1]  Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the page.

1   Code § 17500 *et seq.*; (3) California's common-law of fraud; and (4) the Unfair Competition Law

2   ("UCL"),  Cal. Bus. & Prof. Code § 17200.

3       Ghirardelli argues that Miller lacks standing for the four products he did not buy.  Motion, ECF

4   No. 27, at 8-12.  Ghirardelli also moves to dismiss the claim to the extent it rests on the "unlawful"

5   prong of the UCL Unfair Competition Law, *see* FAC ¶¶ 87 and 88(f), for three reasons: (A) to the

6   extent that it is predicated on a violation of the FDA 2002 "white chocolate" regulation, 21 C.F.R. §

7   163.124 (as incorporated into the California Sherman Food, Drug & Cosmetic Law), the Sherman

8   Law adopted only the 1970 and 1992 FDA regulations and the Legislature never voted on the 2002

9   "white chocolate" FDA regulation; (B) to the extent that it is predicated on the FDA regulation on

10   "imitation" and "artificially flavored," 21 C.F.R. § 101.3 (as incorporated into the Sherman Law),

11   Plaintiff did not allege that the product is nutritionally inferior or contains artificial flavoring; and

12   (c) to the extent that it is predicated on the "common or usual name" regulation, 21 C.F.R. § 102.5

13   (as incorporated into the Sherman Law), Plaintiff did not allege a violation of the regulation, and no

14   "common or usual name" has been established for the products at issue in this case.  *Id.* at 6-7.

15       Plaintiff does not have standing for the products he did not purchase, and the court grants the

16   motion to dismiss only on that basis and denies the motion on all other grounds.

## STATEMENT

18       Ghirardelli is a California corporation that manufactures and markets premium chocolate

19   products and other products.  FAC ¶¶ 3, 9, 13.  Scott Miller, who resides in Auburndale, Florida,

20   generally accuses Ghirardelli Chocolate of misleading customers into believing its products

21   contained chocolate and failing to disclose that they contained no chocolate, white chocolate, or

22   cocoa derivatives.   *Id.* ¶¶ 1-2.

23   ## I. MILLER BUYS "PREMIUM BAKING CHIPS – CLASSIC WHITE"

24       On June 24, 2012, Miller wanted to buy white chocolate chips and ultimately bought

25   "Ghirardelli Chocolate's Premium Baking Chips – Classic White" ("baking chips").  *Id.* ¶¶ 40-41.

26   In deciding which product to purchase, Miller reviewed the product packaging to satisfy himself that

27   he was buying white chocolate.  *Id.* ¶ 41.  The next day, Miller tasted the baking chips and thought

28   that they did not taste like white chocolate.  *Id.* ¶ 42.  He reviewed the ingredients list on the

1   packaging and noticed that the white chips contained no white chocolate, cocoa, or cocoa butter. *Id.*

2   Miller would not have purchased the baking chips or would have paid less for them but for

3   Ghirardelli Chocolate's allegedly misrepresenting (by omission and commission) their content. *Id.* ¶

4   43.

5   **II. GHIRARDELLI'S MARKETING OF ITSELF AND ITS PRODUCTS IN THIS CASE**

6       **A. Marketing Claims Generally**

7       Ghirardelli claims that it is America's longest continuously operating chocolate manufacturer for

8   more than 150 years and that "'it is one of very few American manufacturers that make chocolate

9   starting from the cocoa bean through to finished products.  Throughout the process, [Ghirardelli

10   claims to take] special steps to ensure that [its] premium chocolate delivers [its] signature intense,

11   smooth-melting chocolate taste.'" FAC ¶ 10 (quoting from www.ghirardelli.com).  Ghirardelli also

12   claims that customers can taste the "'Ghirardelli difference' due to the following:"

13       1.  "'Intensive quality assurance in the selection of cocoa beans means that Ghirardelli accepts
            only the highest-quality beans.  We reject as many as 30% of the beans that are offered to us.
14          Beans that are not selected are sold to other manufacturers.'"

15       2.  "'In all of its chocolate products, Ghirardelli uses a proprietary blend of cocoa beans that has
            been refined over the company's 160-year history to provide the company's distinct and
16          intense chocolate taste.'"

17       3.  "'Ghirardelli roasts the cocoa beans in-house to ensure the company's signature flavor
            profile is consistently maintained in all chocolate products.  We also use a different roasting
18          process whereby they remove the shell first and then roast the small nibs inside.  Because the
            nibs are fairly uniform in size, we have more control over temperature and time, so it can get
19          a more specific flavor.  Other companies roast their beans before removing the shell, which
            requires over-roasting the outside portion of the bean to roast the inside.  This could impart a
20          burned flavor to their chocolate.'"

21       4.  "'Finally, Ghirardelli uses an intensive refining process to ensure that its chocolate truly
            melts in your mouth!  Ghirardelli has no grainy feel because we refine most of our chocolate
22          flakes until they are 18 microns (human hair is 100 microns in diameter).  Other mass market
            chocolates are refined to only 50 microns.'"

23   *Id.* ¶ 11.

24

25       **B. The Five Products In This Case**

26       The FDA has adopted labeling standards for products and definitions for "chocolate" and "white

27

28

chocolate" that are embodied in the California Sherman Law.[2]  This case focuses on "five

Ghirardelli products that are sold and marketed as white chocolate products even though they

contain no chocolate, white chocolate, or cocoa butter":

    1.  Premium Baking Chips – Classic White ("baking chips");

    2.  White Chocolate Flavored Confectionary Coating Wafers ("wafers");

    3.  Sweet Ground White Chocolate Flavor ("white chocolate flavor");

    4.  Premium Hot Beverage – White Mocha ("mocha mix");

    5.  Frappé Classico – Classic White ("frappe").

*Id.* ¶ 13.  Plaintiffs refer to them as the "Fake White Chocolate Products."  *Id.*

The packaging for all five products violates FDA and state regulations by "us[ing] the term

'chocolate' on the primary label panel when the products, in fact, contain no chocolate or white

chocolate, cocoa butter, cacao fat, or any cacao derivatives."  *Id.* ¶ 20.   The image below depicts the

 "chocolate" representation on the products' packaging:[3]

Miller specifies that

UNITED STATES DISTRICT COURT
For the Northern District of California

---

    [2] The relevant regulations are discussed below.  Because Plaintiff intertwines them with fact allegations, sometimes this Statement references Plaintiff's allegations with regard to how the facts show a violation of the federal regulations.

    [3] The image is a detail from the frappe label that the court previously judicially noticed.  *See* Order, ECF No. 20 at 3 n.2; Saunders Decl. Ex. F, ECF No. 9-6 at 2 (image source).

[t]he word 'Chocolate' is used on the front panel immediately following the brand name 'Ghirardelli®' in a manner that suggests that it is the 'characterizing flavor,' 21 C.F.R. § 101.11(i), of the product. The label shows 'Ghirardelli®' is the brand name (as it is followed by the registered trademark symbol) and 'Chocolate' as the flavor (as it is in a smaller font and not followed by any trademark symbol. . . . [E]ven if 'Ghirardelli® Chocolate' were deemed a brand, the regulations would require the statements about 'artificial' or 'imitation' immediately following that trademark or brand. *Id.* § 101.22(i)(3), 101.3.

*Id.* ¶ 21. The use of the word "chocolate" misleads customers into believing that the five products contain chocolate when they do not contain chocolate, white chocolate, or cocoa derivatives and instead are "artificial" or "imitation." *Id.* ¶ 2.

The pricing allegedly does too: Ghirardelli intentionally prices the five products at the same price as "its similar real (dark or milk) chocolate products," which further deceives customers into believing that the five products contain chocolate. *Id.* ¶ 22. For example, (1) the "Fake White Chocolate Chips" are sold at the same price as the real milk-chocolate, dark-chocolate, and bittersweet-chocolate chips; (2) the "Fake Ground White Chocolate" is sold at the same price as the ground chocolate/ground cocoa; (3) the "Fake White Mocha" is sold at the same price as the real coffee-flavored mocha; and (4) the "Fake White Chocolate Wafers" are sold at the same prices as the real dark chocolate wafers. *Id.* This pricing also deceives customers into believing that the five products contain chocolate. *Id.* Customers pay a premium for "Fake White Chocolate Products" that cost Ghirardelli less to manufacture than the real products. *Id.*

Ghirardelli did not disclose that the products were not chocolate or white chocolate, and they were not flavored with chocolate or white chocolate. *Id.* ¶ 23. To do so, federal regulations required them to label the front label or the primary label panel with "Imitation" or, if an ingredient simulated the chocolate flavor, state that ingredient as the flavor or state "artificial" or "artificially flavored." *Id.* ¶ 23. Thus, all packaging violated federal and state regulations. *Id.*

## C. Additional Allegations About the Baking Chips That Miller Bought

Miller alleges that the packaging for the chips that he purchased is deceptive for additional reasons. *Id.* ¶¶ 24-39. The packaging refers to the baking chips as "Classic White," and "Premium," which misleads consumers into believing that the product is classic white chocolate and a premium white chocolate chip. FAC ¶ 24. The packaging also makes the following deceptive claim:

The luxuriously deep flavor and smooth texture of Ghirardelli Premium Baking Chocolate

UNITED STATES DISTRICT COURT
For the Northern District of California

delivers the ultimate chocolate indulgence. We hand-select the world's finest cocoa beans and roast them to perfection and then blend the purest ingredients to achieve our award-winning chocolate. For our **Classic White Baking Chips**, pure vanilla and whole milk powder combine to create rich, melt-in-your-mouth bliss. Experience the Ghirardelli difference:

- All Natural ingredients
- Luxuriously smooth and creamy
- Finest grind for smoothest texture and easiest melting.

*Id.*; *see* Saunders Decl. Supp. Motion to Dismiss Complaint, ECF No. 9 ¶¶ 3-4; *id.* Ex. A, ECF No. 9-1 at 3; *id.* Ex. B, ECF No. 9-2.[4]

Miller alleges that "there is no chocolate or white chocolate" in the chips, and thus the product "cannot deliver a deep chocolate flavor or texture' or the "ultimate chocolate indulgence.'" *Id.* ¶ 24. The product is not "'ground' from cocoa beans" like real white chocolate and thus cannot contain the 'Finest grind for smoothest texture and easiest melting.'" *Id.* The phrases "'luxuriously deep . . . ultimate chocolate indulgence' and 'finest grind for smoothest texture and easiest melting'" are "particularly misleading because the *identical* language appears on the packaging of another product . . . : the Ghirardelli® Chocolate White Chocolate Premium Baking Bar[, which] . . . *does* in fact contain white chocolate (a.k.a. at least 20% cocoa butter). Indeed, the first listed ingredient is 'White chocolate.'" *Id.* ¶ 25. Customers who see both products, which likely will be near each other on retail shelves or on the Ghirardelli website and which will be priced the same, will assume that both contain the same ingredients. *Id.*

The use of "Classic White" on the baking chips packaging is deceptive because it suggests that the product is unchanged from the "original" Ghirardelli® Chocolate Premium Baking Bar – White Chocolate," which contains white chocolate. *Id.* ¶ 26 (analogizing to "Coke Classic"). Ghirardelli also labels other real white chocolate products as "Classic White" and "Sublime White." *Id.*

Miller alleges that Webster's Dictionary defines "chocolate" as "a food prepared from ground roasted cacao beans" and "white chocolate" as "a confection of cocoa butter, sugar, milk solids, lecithin, and flavorings." *Id.* ¶ 27. Besides its affirmative misrepresentations, Ghirardelli fails to disclose that the white chips are not white chocolate and/or that they do not contain white chocolate

---

[4] The quoted language is taken from the FAC and from the baking chips product packaging judicially noticed in connection with Ghirardelli's motion to dismiss Miller's original complaint.

1    or cocoa butter. *Id.* ¶ 28.

2      **D. Additional Allegations About Marketing Beyond Those in Section A, Above**

3      Ghirardelli's website, www.Ghirardelli.com, discusses the "history and preeminence" of

4   Ghirardelli Chocolate products but does not disclose that the Products are not chocolate. *Id.* ¶ 30.

5   The Ghirardelli website also lists the baking chips as "Classic White Chocolate Baking Chips"

6   instead of "Premium Baking Chips – Classic White" and refers to the Sweet Ground White

7   Chocolate Flavor as "Sweet Ground White Chocolate," without the word "flavor." *Id.* ¶ 31.

8      The Ghirardelli website also allows customers to "Shop By Product" and choose "White

9   Chocolate" as a category. *Id.* ¶ 34. The website then presents the baking chips, the wafers, and the

10   ground white chocolate flavor alongside real white chocolate products such as the White Chocolate

11   Baking Bar and the Classic White Chocolate Flavored Sauce. *Id.*

12      Ghirardelli advertises on the internet by purchasing key words such as "white chocolate" and

13   asks consumers "if they 'Want White Chocolate?'" *Id.* ¶ 35. Consumers who follow the link on

14   Ghirardelli's advertisements are taken to Ghirardelli's website and offered the "Fake White

15   Chocolate Products." *Id.* Ghirardelli sells a cookbook that contains recipes for its products,

16   including the "Fake White Chocolate Chips." *Id.* ¶ 32. For example, a recipe for "White Chocolate

17   Mixture" calls for mascarpone cheese and "Ghirardelli Classic White Chocolate Chips." *Id.*

18      Ghirardelli also trains store personnel at its retail locations to "inform customers that *all* the

19   Ghirardelli products are real chocolate products." *Id.* ¶ 33. Customers who ask for "white chocolate

20   chips" are directed to the "Fake White Chocolate Chips" without being told that they do not contain

21   chocolate. *Id.* In one instance, an investigator asked a Ghirardelli store employee "if there were any

22   non-chocolate Ghirardelli products that he could purchase for a friend with a chocolate allergy; the

23   employee stated (as trained to do), that there were none." *Id.*

24      Ghirardelli permits its marketing partners, including grocery stores, to advertise, market, and sell

25   the "Fake White Chocolate Products" as real white chocolate. *Id.* ¶ 36. Ghirardelli provides its

26   marketing partners with information that refers to the "Fake White Chocolate Products" as "real

27   white chocolate." *Id.* For example, the marketing material Ghirardelli provides retailers for the

28   baking chips tells retailers that the product name is "Classic White Chocolate Chips," and retailers

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1  use this name when displaying the baking chips on store shelves.  *Id.* ¶ 36.

2  **III.  CLASS ALLEGATIONS, JURISDICTION, CLAIMS, AND RELIEF SOUGHT**

3      Miller seeks to represent a class of allegedly similarly situated persons, defined as:

4      All persons who, between August 17, 2008 and the present, purchased, in the United States,
       any of the following products that have the word "Chocolate" on the primary display panel:
5      "Ghirardelli® Chocolate Premium Baking Chips – Classic White," "Ghirardelli® Chocolate
       White Chocolate Flavored Confectionary Coating Wafers," "Ghirardelli® Chocolate Sweet
6      Ground White Chocolate Flavor," "Ghirardelli® Chocolate Premium Hot Beverage – White
       Mocha," or "Ghirardelli® Chocolate Frappé Classico – Classic White" (the "Class").

7

8  *Id.* ¶ 44.  Miller also seeks to represent a subclass of "all members of the Class who purchased

9  'Ghirardelli® Chocolate Premium Baking Chips – Classic White."  *Id.*  The parties do not dispute

10  that at the time of removal, the allegations met the jurisdictional requirements under the Class

11  Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d).  *See* Notice of Removal, ECF No. 1,

12  ¶¶ 5, 9, 13, 15 (setting forth facts establishing the jurisdictional thresholds).  Miller brings four

13  claims.

14      First, on behalf of himself and the subclass, he claims that Ghirardelli violated the CLRA, Cal.

15  Civ. Code §§ 1770(a)(2), (5), (7), (8), and (9), which prohibits the following:

16      (2) Misrepresenting the source, sponsorship, approval, or certification of goods or services.

17      (5) Representing that goods or services have sponsorship, approval, characteristics,
        ingredients, uses, benefits, or quantities which they do not have or that a person has a
18      sponsorship, approval, status, affiliation, or connection which he or she does not have.

19      (7) Representing that goods or services are of a particular standard, quality, or grade, or that
        goods are of a particular style or model, if they are of another.
20
        (8) Disparaging the goods, services, or business of another by false or misleading
21      representation of fact.

22      (9) Advertising goods or services with intent not to sell them as advertised.

23  *See id.* ¶ 58.  Miller states that Ghirardelli led customers to falsely believe that the baking chips were

24  (or contained) chocolate, white chocolate and/or its principal ingredient, cocoa butter.  *Id.* ¶ 59.  He

25  specifically alleges that his claims under § 1700(a)(8) are based on Ghirardelli's website marketing

26  representations that are summarized above in Section II. A.  *See id.* ¶¶ 10-11, 59.[5]  Miller seeks

27  _____

28      [5] Paragraph 59 of the FAC refers to rejecting "as many as 40% of the beans" while paragraph
    11 refers to "30%."

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

compensatory and punitive damages, restitution, injunctive relief, fees, and costs.  *Id.* ¶¶ 60-62.

Second, on behalf of himself and the subclass, he claims a violation of the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, based on Ghirardelli's misrepresentations, statements, and omissions that led reasonable customers to believe that they were purchasing white chocolate when in fact the baking chips did not contain any chocolate, white chocolate, cocoa, or cocoa butter.  *Id.* ¶¶ 63-73.  He seeks restitution and declaratory and injunctive relief.  *Id.* ¶¶ 70-72.

Third, on behalf of himself and the subclass, Miller claims common law fraud, deceit, and/or misrepresentation based on the allegedly fraudulent representations and omissions leading to the belief that the baking chips were real white chocolate chips when they did not contain chocolate, white chocolate, or cocoa butter.  He seeks compensatory and punitive damages.  *Id.* ¶¶ 74-84.

Fourth, he claims violations of the UCL, Cal. Bus. & Prof. Code § 17200, *et seq. Id.* ¶¶ 85-98. On behalf of the Subclass, Miller claims that Ghirardelli violated the all three UCL prongs based on the misrepresentations and omissions alleged throughout the FAC about the baking chips and, under the unlawful prong, for violating the CLRA, FAL, and 14 sections of the Sherman Food, Drug and Cosmetic Law, Cal. Health & Saf. Code § 109875, *et seq. Id.* ¶ 88.

Miller's sole claim on behalf of the Class is for violation of the unlawful prong of the UCL

> by including the word "Chocolate" on the primary display panel of the Fake White Chocolate Products without stating that the produc[ts] are "Imitation," "Artificial" and/or "Artificially Flavored," in violation of Cal. Health & Safety Code § 110100(a), 110380, and 110505, which incorporate 21 C.F.R. §§ 101.3, 101.22 and 102.5.

*Id.* ¶ 87.  Miller seeks restitution and declaratory and injunctive relief.  *Id.* ¶¶ 93-94, 96.

## IV.  PROCEDURAL HISTORY

Miller filed suit in San Francisco County Superior Court, and Ghirardelli removed to federal court and moved to dismiss the complaint.  *See* Notice of Removal, ECF No. 1 at 1; Complaint, ECF No. 1 at 11; Motion to Dismiss, ECF No. 7.  The court granted, in part, the motion to dismiss on the ground that Miller lacked standing for products he had not purchased.  *See* Order, ECF No. 20, at 18. The analysis – based on the allegations in the complaint – was that the products were too different, and their packaging too dissimilar, from the baking chips that Miller did buy.  *Id.* at 10-13.  At oral argument, however, Plaintiff argued that under 21 C.F.R. § 101.22(c)(i)(3), "the combination of the

**UNITED STATES DISTRICT COURT**
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   'Ghirardelli Chocolate' branding on the front of the label on top of the characterization of the

2   product means that – under the FDA regulations and standards – the harm is identical across product

3   lines" and that established standing.  *Id.* at 13.  The court thus granted Miller 21 days to file an

4   amended complaint.  *Id.* at 13, 18.

5       Miller filed the FAC on January 11, 2012, and Ghirardelli again moved to dismiss.  *See* FAC,

6   ECF No. 24; Motion to Dismiss FAC ("Motion"), ECF No. 27.

7                                    **ANALYSIS**

8       The UCL "unlawful prong" claim alleges that by including the word "Chocolate" on the primary

9   display panel of the five products without stating that the products were "Imitation," "Artificial"

10  and/or "Artificially Flavored," Ghirardelli violated the Sherman Law's incorporation of three FDA

11  regulations: (A) 21 C.F.R. § 101.3, which defines "white chocolate;" (B) 21 C.F.R. § 101.22, which

12  is the regulation about on "imitation" and "artificially flavored;" and (C) 21 C.F.R. § 102.5, which

13  regulates the "common or usual name."  FAC ¶ 87.[6]  Ghirardelli argues that Plaintiff (1) does not

14  have standing for the products that he did not purchase and (2) fails to state a claim.

15  **I. STANDING**

16      The court's previous order had a detailed section on standing.  *See* 12/7/12 Order, ECF No. 12 at

17  7-9.  The court incorporates the general standards here by reference and thus does not repeat the

18  constitutional requirements and prudential considerations for federal jurisdiction.  Also, the court

19  notes that standing for the UCL claim requires a plaintiff to demonstrate "economic injury," which is

20  "substantially narrower than federal standing . . . which may be predicated on a broader range of

21  injuries."  *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323-24 (2011).  *Id.* at 324.

22      The court's analysis of standing in this consumer case has been grounded in a comparison of the

23  front labels and packaging of the five products here with the context-specific analysis that courts use

24

25

26      [6] The UCL prohibits business practices that are either unlawful, unfair, or fraudulent.  Cal.
    Bus. & Prof. Code § 17200; *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003).
27  "Unlawful practices" are those "forbidden by law, be it civil or criminal, federal, state, or municipal,
    statutory, regulatory, or court-made."  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 838-39
28  (1994).  An unlawful business practices claim borrows violations of other laws and treats them as
    unlawful predicates that are independently actionable under the UCL.  *Id.*

1  to analyze standing for class-action plaintiffs who have not purchased products.  This section starts

2  with some of the court's analysis from the prior order and how it applied it to the claims, and then,

3  with that context, turns to the arguments here.

4  **A. Standing to Sue Over Products a Named Plaintiff Never Purchased**

5  There is no controlling authority on whether Plaintiffs have standing for products they did not

6  purchase.  *See, e.g., Donohue v. Apple, Inc.*, No. 11-cv-05337, 2012 U.S. Dist. LEXIS 65860, at *16

7  (N.D. Cal. May 10, 2012) (collecting cases).  The prior order first compared the cases that required

8  purchase with the cases that did not.  12/712 Order, ECF No. 20, at 8-9.  The order found more

9  persuasive the cases that concluded that Plaintiffs who do not purchase a product nonetheless may

10 have standing if the products and alleged misrepresentations were substantially similar.  *Id.* at 9.

11 The analysis then was about what products and alleged misrepresentations were substantially

12 similar.  *Id.* at 9-10.  For example, in *Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. C-11-2910

13 EMC, 2012 WL 2990766, at *11 (N.D. Cal. July 20, 2012), the district court found sufficient

14 similarity where the plaintiffs challenged:

15     the same kind of food products (i.e., ice cream) as well as the same labels for all of the
       products–i.e., "All Natural Flavors" for the Dreyer's/Edy's products and "All Natural Ice
16     Cream" for the Haagen–Dazs products.  That the different ice creams may ultimately have
       different ingredients is not dispositive as Plaintiffs are challenging the same basic
17     mislabeling practice across different product flavors.

18 2012 WL 2990766, at *13.  Similarly, in *Anderson v. Jamba Juice Co.*, the court held that the

19 plaintiff, who purchased several flavors of at-home smoothie kits labeled "All Natural," had

20 standing to bring claims on behalf of purchasers of other flavors because the products were

21 sufficiently similar and because the "same alleged misrepresentation was on all of the smoothie

22 kit[s] regardless of flavor . . . ."  No. 12-CV-01213 YGR, 2012 U.S. Dist. LEXIS 120723, at *15

23 (N.D. Cal. Aug. 25, 2012).

24 Where product composition is less important, the cases turn on whether the alleged

25 misrepresentations are sufficiently similar across product lines.  For example, in *Koh v. S.C. Johnson*

26 *& Son, Inc*, No. C-09000927 RMW, 2010 U.S. Dist. LEXIS 654, at *2, *6-7 (Jan. 5, 2010), the

27 plaintiff purchased Windex brand glass cleaner that bore a label suggesting the product was

28 environmentally-friendly.  He also sought to challenge the defendant's use of the identical label on

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

C 12-04936 LB (ORDER)

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Shout brand stain remover that he had not purchased.  *Id.* at *2.  Because the labels were identical,

2   the court denied defendant's motion to dismiss for lack of standing and deferred ruling on the

3   standing question until class certification.  *Id.* at *7.

4       Where the alleged misrepresentations or accused products are dissimilar, courts tend to dismiss

5   claims to the extent they are based on products not purchased.  For example, in *Larsen v. Trader*

6   *Joe's Co.*, No. 11-cv-5188-SI (Docket No. 41) (N.D. Cal. June 14, 2012), the court found that the

7   plaintiffs lacked standing to bring claims based on products they did not purchase.  There, the

8   plaintiffs challenged "a wide range of Trader Joe's products (cookies, apple juice, cinnamon rolls,

9   biscuits, ricotta cheese, and crescent rolls) which bear little similarity."  *Astiana*, 2012 WL2990766,

10  at *13 (finding *Larsen* distinguishable).  And in *Stephenson v. Neutrogena*, the court dismissed

11  claims based on products not purchased where plaintiff brought suit over six Neutrogena Naturals

12  products but had only purchased the purifying facial cleanser.  *Stephenson v. Neutrogena*,

13  No. C-12-0426 PJH, 2012 U.S. Dist. LEXIS 1005099, at *1 (N.D. Cal. Jul. 27, 2012).

14      The order then analyzed the five products here.  *See* 12/7/12 Order ECF No. 20, at 10-13.

15  Ultimately, the holding was that – even though the products' labeling on the front (by juxtaposition

16  to the words "Ghirardelli® Chocolate") suggests a connection to chocolate and white chocolate – the

17  fact that they were "Ghirardelli® Chocolate" products did not change the conclusion that they were

18  too dissimilar.  *Id.* at 11.  The order concluded that the products were too different: they look

19  different; they have different uses (baking chips, drink powders, and wafers); they have different

20  labels and different representations on packaging (in the form of the "romance" language designed

21  to convey the experience of the product); and they are marketed and sold differently in that, for

22  example, some are sold alongside each other, and some are sold in commercial markets and others in

23  consumer markets.  *Id.*

24  ### B. Standing Regarding Products In This Case

25      The FAC now contains a UCL "unlawful" prong claim with a class limited to purchasers of the

26  five products, all with the word "Chocolate" (displayed under "Ghirardelli®").  The predicate UCL

27  violations are about whether using the words "Ghirardelli® Chocolate" in the manner in which they

28  are used on the front label runs afoul of federal regulations adopted into law in California.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Ghirardelli challenges Miller's contention that "Ghirardelli® Chocolate" conveys something to

2   consumers merely by placement of the words on the packaging for the five products.  Motion, ECF

3   No. 27 at 10.)   It argues that "Ghirardelli® Chocolate" is only a logo that would not, for example,

4   create confusion on a package of jelly beans or bagels.  *Id.*  Instead, it is like "Dunkin' Donuts,"

5   which also is identified with products such as coffee, and one does not assume that the coffee will

6   taste like donuts.  *Id.* & n.3.  To find out what a product is, or what its characterizing flavor is, a

7   consumer must review the label.  *Id.* at 10-11.  Whether consumers reasonably can read the label as

8   suggesting that the products contain white chocolate or cacao butter depends on what the entire label

9   says.  *Id.* at 12.  Because the products and labels here are dissimilar, Ghirardelli concludes, Miller

10  can sue only about the product he bought.  *Id.*

11      Plaintiff rejects Ghirardelli's argument that a consumer has to read the entire label because a

12  "logo" cannot suggest what the product is or what the characterizing flavor must be.  *Id.* at 12.   Not

13  only is "Ghirardelli® Chocolate" not a logo (and instead is a trademark (Ghirardelli®) followed by a

14  product description underneath (Chocolate), but also the word "Chocolate" does suggest what a

15  product is and what the characterizing flavor must be.  *Id.* at 9 n.7, 12.  There are regulations about

16  the use of the word "chocolate."  *Id.* at 12.  Also, representations about (for example) "Sugar in the

17  Raw" are different than including the product flavor "Chocolate" immediately under the brand name

18  "Ghirardelli®" on the primary label, *id.*, presumably because "Sugar in the Raw" more obviously

19  cannot be true.  Similarly, unlike the fake-fruits-in-the-cereal cases where the representations are

20  obvious, they are not obvious here.  *Id.* at 13.  Put another way, Miller argues that – at least at the

21  pleadings stage – "chocolate" carries a specific regulatory meaning, Ghirardelli used the word

22  "Chocolate" on the primary display panel (and it was not chocolate), and the UCL claims predicated

23  the misuse of the regulatory term thus survive the motion to dismiss.

24      The court previously concluded that the product representation conveyed by "Ghirardelli®

25  Chocolate" was relatively unimportant considering the varying products, packaging and

26  representations, and markets.  And Ghirardelli's point – that logos cannot be dispositive of what a

27  product is and that a consumer determines what a product or characterizing flavor is by reviewing

28  the label – makes a lot of sense, especially in the context of "Dunkin' Donuts."  But Miller's

UNITED STATES DISTRICT COURT
For the Northern District of California

argument is different: the identical representation "Ghirardelli® Chocolate" means something with the five products, which are not coffee or bagels or mugs or baking dishes or almond syrup or whatever other products Ghirardelli might brand.  They are all items that look like white chocolate with front labels that all say – above the product description – "Ghirardelli® Chocolate."  He argues that he has standing because the "chocolate" statement on the Products is identical on all Products, *see* FAC, ECF No. 24, ¶ 20,  "chocolate" has an objective meaning in the applicable regulations, and the "chocolate" statement thus misrepresents the products' identity.[7]  Opp'n, ECF No. 29 at 11-12 & n.11; *see* FAC, ECF No. 24, ¶ 17.

Miller's best argument is that the term "chocolate" includes "white chocolate."  *See, e.g., id.* ¶ 29.  That would mean that the injuries suffered by the putative class members are indistinguishable for the five products, giving him standing.  *Id.*  The problem is that an "unlawful" claim based on "chocolate" necessarily reaches back to the FDA definition.  Identity labeling of food requires – under the plain language of the regulation – that the statement of identity of the commodity on the principal display panel of a food in package form be "the name . . . required by any applicable Federal law or regulation."  21 C.F.R. § 101.3(a) & (b)(1).  That identity of the commodity here under FDA regulations is "white chocolate," not "chocolate."  That in turn means that a determination of standing is back to an examination of the entire label, and the court previously found that – even with the juxtaposition of "Ghirardelli®" to "Chocolate" and the resulting implication of a connection to chocolate – the five products and the alleged misrepresentations were not sufficiently similar.  12/7/12 Order, ECF No. 20 at 10-13.  In sum, Miller has standing only for the product he purchased.

## II. MOTION TO DISMISS UCL CLAIM

Ghirardelli asserts that Plaintiff failed to state a claim for three reasons:  (A) the Sherman Law adopted only the 1970 and 1992 regulations and not the white chocolate regulation, 21 C.F.R. § 163.124, which is a 2002 regulation; (B) Plaintiff does not state a claim under 21 C.F.R. § 101.3 because he did not allege that the product is nutritionally inferior or contains artificial flavoring; and

---

[7]  As discussed below, the applicable standards of identity define chocolate and white chocolate as distinct foods.  *See* 21 C.F.R. §§ 163.111, 163.124 (both quoted below).

(C) Plaintiff did not allege a violation of the "common or usual name" regulation, 21 C.F.R. § 102.5, and no "common or usual name" has been established for the products at issue in this case. Opposition, ECF No. 27 at 13-21.

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" and must give a defendant fair notice of the claims and the grounds for relief. Fed. R. Civ. P. 8(a)(2); *see Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). A complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly,* 550 U.S. at 557). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555 (internal citations and parentheticals omitted)

The order sets forth the regulatory framework and then addresses Ghirardelli's challenges to the claim.

## A. REGULATORY FRAMEWORK

### 1. Sherman Act

The UCL "unlawful" claim is predicated on violations of California's Sherman Food, Drug and Cosmetic Law, Cal. Health & Saf. Code § 110765 *et seq.*, which broadly incorporates all food labeling regulations including standards of identity and any amendments to those regulations promulgated by the FDA under the Food, Drug, and Cosmetics Act ("FDCA"), 21 U.S.C. § 301, *et seq.*[8] *See In re Farm Raised Salmon Cases,* 42 Cal. 4th 1077, 1087 (2008). Miller asserts violations

---

[8] The FDCA does not provide a private right of action, *see, e.g.,* 21 U.S.C. § 337; *Pom Wonderful LLC v. Coca-Cola Co.,* 679 F.3d 1170, 1175 (9th Cir. 2012), and Miller expressly disclaims any claim based directly on the FDCA, *see* FAC, ECF No. 24 at 17. Instead, he "relies on

UNITED STATES DISTRICT COURT
For the Northern District of California

of three provisions of the Sherman Law:

**Cal. Health & Saf. Code § 110100(a) (1992)**:  All food labeling regulations and any amendments to those regulations adopted pursuant to the [FDCA], in effect on January 1, 1993, or adopted on or after that date, shall be the food labeling regulations of this state.

**Cal. Health & Saf. Code § 110380 (1970)**:  All regulations and their amendments pertaining to foods, . . . that are in effect on the effective date of this part, or that are adopted on or after that date, pursuant to the Fair Packaging and Labeling Act (80 Stat. 1296; 15 U.S.C. § 1451, *et seq.*), shall be the regulations of this state.

**Cal. Health & Saf. Code § 110505 (1970)**:  Definitions and standards of identity . . . and any amendments to the definitions and standards, adopted pursuant to the [FDCA] in effect on the effective date of this part, or adopted on or after that date, are the definitions and standards of identity . . . in this state.

### 2.   *FDA Regulations*

The FDA regulations implicated in this case start with 21 C.F.R. § 101.3's requirement that

(a) The principal display panel of a food in package form shall bear as one of its principal features a statement of the identity of the commodity.

(b) Such statement of identity shall be in terms of

(1) The name now or hereafter specified in or required by any applicable Federal law or regulation; or, *in the absence thereof*;

(2) The common or usual name of the food; or in the absence thereof;

(3) An appropriately descriptive term, or when the nature of the food is obvious, a fanciful name commonly used by the public for such food.

Then, the next regulations are the ones defining chocolate.  The FDA has prescribed standards of identity for chocolate and for white chocolate.  The "Chocolate Standard" provides:

Chocolate [] is the solid or semiplastic food prepared by finely grinding cacao nibs. The fat content of the food may be adjusted by adding one or more of the optional ingredients specified in paragraph (b)(1) of this section to the cacao nibs. Chocolate liquor contains not less than 50 percent nor more than 60 percent by weight of cacao fat as determined by the method prescribed in § 163.5(b).

21 C.F.R. § 163.111(a)(1).[9]  The "White Chocolate Standard" provides:

---

the FDCA and FDA regulations only to the extent [they] have been separately enacted as state law or regulation or provide a predicate basis of liability" under state and common law."  *Id.*

   [9]  The standard cited defines "Chocolate liquor," but the regulation later explains that "The name of the food is 'chocolate liquor', 'chocolate', 'unsweetened chocolate', 'bitter chocolate', 'baking chocolate', 'cooking chocolate', 'chocolate coating', or 'unsweetened chocolate coating'."

UNITED STATES DISTRICT COURT
For the Northern District of California

(1) White chocolate is the solid or semiplastic food prepared by intimately mixing and grinding cacao fat with one or more of the optional dairy ingredients specified in paragraph (b)(2) of this section and one or more optional nutritive carbohydrate sweeteners and may contain one or more of the other optional ingredients specified in paragraph (b) of this section. White chocolate shall be free of coloring material.

(2) White chocolate contains not less than 20 percent by weight of cacao fat as calculated by subtracting from the weight of the total fat the weight of the milkfat, dividing the result by the weight of the finished white chocolate, and multiplying the quotient by 100. The finished white chocolate contains not less than 3.5 percent by weight of milkfat and not less than 14 percent by weight of total milk solids, calculated by using only those dairy ingredients specified in paragraph (b)(2) of this section, and not more than 55 percent by weight nutritive carbohydrate sweetener.

21 C.F.R. § 163.124.  Thus, products made in accordance with these standards of identity must carry be labeled as "chocolate" or "white chocolate," whichever is appropriate.

Then, other FDA regulations mandate labeling regarding imitation products and the use of flavoring.  21 C.F.R. § 101.3, which is the "imitation regulation," mandates that foods that fall within the scope of the definition of "imitation" must be labeled as imitations.

(e) Under the provisions of section 403(c) of the Federal Food, Drug, and Cosmetic Act, a food shall be deemed to be misbranded if it is an imitation of another food unless its label bears, in type of uniform size and prominence, the word "imitation" and, immediately thereafter, the name of the food imitated.

21 C.F.R. § 101.3(e).  An imitation food "is a substitute for and resembles another food but is nutritionally inferior to that food," as determined by comparing the percentages of the "essential nutrients" in the substitute and in the food for which it substitutes.[10]  21 C.F.R. § 101.3(e)(1)-(4).  A

---

21 C.F.R. § 163.111(c).

[10]  The full text of 21 C.F.R. § 101.3(e)(1)-(4) states:

 (1) A food shall be deemed to be an imitation and thus subject to the requirements of section 403(c) of the act if it is a substitute for and resembles another food but is nutritionally inferior to that food.

(2) A food that is a substitute for and resembles another food shall not be deemed to be an imitation provided it meets each of the following requirements:

(i) It is not nutritionally inferior to the food for which it substitutes and which it resembles.

(ii) Its label bears a common or usual name that complies with the provisions of § 102.5 of

food is not an imitation if "[i]t is not nutritionally inferior to the food for which it substitutes and which it resembles" and its label complies with 21 C.F.R. § 102.5 (discussed below) and is not false or misleading.  *Id.* § 101.3(e)(2).

Similarly, 21 C.F.R. § 101.22 (the "flavoring regulation") requires products to be labeled as, for example, "artificial," "artificially flavored," or "naturally flavored," depending on their content.

> (i) If the label, labeling, or advertising of a food makes any direct or indirect representations with respect to the primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means, or if for any other reason the manufacturer or distributor of a food wishes to designate the type of flavor in the food other than through the statement of ingredients, such flavor shall be considered the characterizing flavor and shall be declared in the following way:
>
> . . .

---

this chapter and that is not false or misleading, or in the absence of an existing common or usual name, an appropriately descriptive term that is not false or misleading. The label may, in addition, bear a fanciful name which is not false or misleading.

(3) A food for which a common or usual name is established by regulation (e.g., in a standard of identity pursuant to section 401 of the act, in a common or usual name regulation pursuant to part 102 of this chapter, or in a regulation establishing a nutritional quality guideline pursuant to part 104 of this chapter), and which complies with all of the applicable requirements of such regulation(s), shall not be deemed to be an imitation.

(4) Nutritional inferiority includes:

(i) Any reduction in the content of an essential nutrient that is present in a measurable amount, but does not include a reduction in the caloric or fat content provided the food is labeled pursuant to the provisions of § 101.9, and provided the labeling with respect to any reduction in caloric content complies with the provisions applicable to caloric content in part 105 of this chapter.

(ii) For the purpose of this section, a measurable amount of an essential nutrient in a food shall be considered to be 2 percent or more of the Daily Reference Value (DRV) of protein listed under § 101.9(c)(7)(iii) and of potassium listed under § 101.9(c)(9) per reference amount customarily consumed and 2 percent or more of the Reference Daily Intake (RDI) of any vitamin or mineral listed under § 101.9(c)(8)(iv) per reference amount customarily consumed, except that selenium, molybdenum, chromium, and chloride need not be considered.

(iii) If the Commissioner concludes that a food is a substitute for and resembles another food but is inferior to the food imitated for reasons other than those set forth in this paragraph, he may propose appropriate revisions to this regulation or he may propose a separate regulation governing the particular food.

UNITED STATES DISTRICT COURT
For the Northern District of California

(2) If the food contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor, in letters not less than one-half the height of the letters used in the name of the food and the name of the characterizing flavor shall be accompanied by the word(s) "artificial" or "artificially flavored", in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., "artificial vanilla", "artificially flavored strawberry", or "grape artificially flavored".

21 C.F.R. § 101.22(i).  The regulation defines artificial flavor as follows:

(a)(1) The term artificial flavor or artificial flavoring means any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof. Artificial flavor includes the substances listed in §§ 172.515(b) and 182.60 of this chapter except where these are derived from natural sources.

21 C.F.R.  § 101.22(a)(1).

21 C.F.R. § 102.5 (the "common or usual name regulation") provides criteria for discerning the common or usual name of a food for labeling purposes:

(a) The common or usual name of a food, which may be a coined term, shall accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients. The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.

(b) The common or usual name of a food shall include the percentage(s) of any characterizing ingredient(s) or component(s) when the proportion of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present in an amount greater than is actually the case. . . .

(c) The common or usual name of a food shall include a statement of the presence or absence of any characterizing ingredient(s) or component(s) and/or the need for the user to add any characterizing ingredient(s) or component(s) when the presence or absence of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance or when the labeling or the appearance of the food may otherwise create an erroneous impression that such ingredient(s) or component(s) is present when it is not, and consumers may otherwise be misled about the presence or absence of the ingredient(s) or component(s) in the food. The following requirements shall apply unless modified by a specific regulation in subpart B of this part. . . . .

(d) A common or usual name of a food may be established by common usage or by establishment of a regulation in subpart B of this part, in part 104 of this chapter, in a standard of identity, or in other regulations in this chapter.

**B.  WHITE CHOCOLATE REGULATION**

Preliminarily, Ghirardelli argues that the Sherman Law sections in the previous section –

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    California Health & Safety Code sections 110100 (1992), 110380 (1970), and 110505 (1970) – are

2    unconstitutional delegations of the California Legislature's lawmaking function because they

3    incorporate all federal regulations promulgated on or after their effective date.  *See* Mot., ECF No.

4    27 at 13-16.  Because the federal regulation for white chocolate, 21 C.F.R. § 163.124, was not

5    promulgated until 2002, Ghirardelli argues that it does not apply.

6         Federal courts may decide constitutional challenges to state statutes, but only state courts can

7    authoritatively construe state legislation.  *California Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d

8    1141, 1146-47 (9th Cir. 2001).  The federal court's duty is to "look to the words of the statute itself

9    as well as state court interpretations of the same or similar statutes."  *Id.*  Moreover, the federal court

10   must not invalidate a state statute on its face without first determining whether the statute is readily

11   susceptible to a narrowing construction by the state courts.  *Id.*

12        Under California law, duly enacted statutes are presumed constitutional.  *Lockyer v. City &*

13   *County of San Francisco*, 33 Cal. 4th 1055, 1086 (2004).  "Unconstitutionality must be clearly

14   shown, and doubts will be resolved in favor of its validity."  *Id.*  If a statute can be construed in

15   multiple ways, the court will adopt a construction that supports its constitutionality, even if another

16   construction is equally reasonable.  *People ex rel. Reisig v. Broderick Boys*, 149 Cal. App. 4th 1506,

17   1522 (2007). "An unconstitutional delegation of authority occurs only when a legislative body (1)

18   leaves the resolution of fundamental policy issues to others or (2) fails to provide adequate direction

19   for the implementation of that policy."  *Carson Mobilehome Park Owners' Ass'n. v. City of Carson*

20   35 Cal. 3d 184, 190 (1983).  Such a delegation occurs when the public entity has committed a "'total

21   abdication of that [legislative] power, through failure either to render basic policy decisions or to

22   assure that they are implemented as made . . . .'"  *People ex rel. Lockyer v. Sun Pacific Farming Co.*

23   77 Cal. App. 4th 619, 634 (2000) (*quoting Kugler v. Yocum*, 69 Cal. 2d 371, 384 (1968)).  Thus,

24   where the public agency makes the basic policy decisions and provides sufficient safeguards to

25   prevent arbitrary use of delegated power, there is no unconstitutional delegation.  *Lockyer*, 77 Cal.

26   App. 4th at 633; *see also Taylor v. Crane*, 24 Cal. 3d 442, 452-53 (1979) (delegation of authority

27   over personnel matters was constitutional where arbitrator was allowed final word on propriety of

28   discharge and the Legislature did not authority to set terms and conditions of employment or set

UNITED STATES DISTRICT COURT
For the Northern District of California

1   general public policy).

2   The Sherman Law incorporates FDA regulations adopted after its effective date, *see supra* p. 15,

3   and it also provides that any person can object to the incorporation and trigger a delay and review

4   period before the regulation becomes California Law:

5   A federal regulation adopted pursuant to this part takes effect in this state 30 days after it
    becomes effective as a federal regulation.  Any person who will be adversely affected by
6   adoption of the federal regulation in this state may, within the 30 days prior to its becoming
    effective in this state, file with the department, in writing, objections and a request for a
7   hearing.  The timely filing of substantial objections to a regulation that has become effective
    under the federal act, stays the adoption of the regulation in this state.

8

9   *Id.* § 110115.  If objections are filed, the Sherman Law requires a noticed public evidentiary hearing

10  at which "any interested person or his or her representative may be heard." *Id.* § 110125.  The state

11  agency may then "adopt, rescind, or modify" the federal regulation. *Id.*

12  Given this process, and the standard for evaluating constitutionality, the Sherman Law is not

13  unconstitutional.  The California legislature did not abdicate its authority and instead cross-

14  referenced a comprehensive regulatory framework that already applies to products such as

15  Ghirardelli's products anyway.   The court observes that – as Plaintiff points out – the California

16  Supreme Court has applied FDA regulations promulgated in 2007 without questioning the Sherman

17  Law's constitutionality.  *See Farm Raised Salmon Cases*, 42 Cal. 4th at 1086-87.

18  The court denies Ghirardelli's motion to dismiss on this ground.

19  **C. The Imitation, Flavoring, and Common Name Regulations**

20  Miller alleges that Ghirardelli engaged in unlawful trade practices:

21  by including the word "Chocolate" on the primary display panel of the Fake White Chocolate
    Products without stating that the produc[ts] are "Imitation," "Artificial" and/or "Artificially
22  Flavored," in violation of Cal. Health & Safety Code § 110100(a), 110380, and 110505,
    which incorporate 21 C.F.R. §§ 101.3, 101.22 and 102.5.

23

24  FAC, ECF No. 2, ¶ 21.  Ghirardelli argues that Miller's UCL claim fails to the extent it is based on a

25  predicate violation of the imitation regulation, 21 C.F.R. § 101.3(e), the flavoring regulation, *id.*

26  § 101.22, and the common or usual name regulation, *id.* § 102.5.

27  Ghirardelli's argument regarding the imitation regulation is that Miller should have pleaded

28  "nutritional inferiority."  Motion, ECF No. 27 at 17; *see* 21 C.F.R. § 101.3(e)(1) (food is an imitation

UNITED STATES DISTRICT COURT
For the Northern District of California

1  if it is a substitute for and resembles another food but is nutritionally inferior). It also argues that

2  Plaintiff never alleged artificial flavor (a defined term) or that the artificial flavor was used to

3  simulate the characterizing flavor (chocolate). Motion, ECF No. 27 at 18-19. Finally, Plaintiff

4  never alleged that the product has a common name. *Id.* at 19. As Ghirardelli says, if there is a

5  standard of identity for a product, it should be used. *Id.*; *see* 21 C.F.R. § 101.3(a).

6      The complaint gives notice of the claims, and the allegations are more than merely labels or

7  general assertions. At the pleadings stage, and based on the case-specific record, the court

8  concludes that Ghirardelli has enough information to answer the complaint.

9                          **CONCLUSION**

10     Miller does not have standing over products he did not purchase. He otherwise states claims for

11  the California subclass.

12     This disposes of ECF No. 27.

13  **IT IS SO ORDERED.**

14  Dated: April 5, 2013                    _____

15                                          LAUREL BEELER
                                            United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28