UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

SCOTT MILLER, et al.,

        Plaintiffs,

    v.

GHIRARDELLI CHOCOLATE
COMPANY,

        Defendant.

Case No. 12-cv-04936-LB

**FINAL ORDER APPROVING CLASS SETTLEMENT**

[ECF No. 148]

## INTRODUCTION

The parties have agreed to settle this class action. This lawsuit challenges defendant Ghirardelli Chocolate Company's labeling of some of its products. (See 3d Am. Compl. – ECF No. 43.)[1] The court previously approved the settlement preliminarily and conditionally certified a settlement class. (ECF No. 141.) The court has scrutinized the parties' proposed settlement under the controlling law. The court finds the settlement fair, adequate, and reasonable. The court therefore certifies a Rule 23(b)(3) class and approves the parties' settlement. The court maintains its previous appointment of class counsel and representatives, awards the plaintiffs $5000 each in incentives, and awards their attorneys $1,575,000 in fees and $87,572.15 in litigation costs.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of the documents.

# FACTS

This is a food-labeling case. The plaintiffs claim that defendant Ghirardelli Chocolate Company falsely labeled a number of its products. Plaintiffs Scott Miller and Steve Leyton sue for themselves and for a nationwide consumer class. They make two basic claims. They first contend that Ghirardelli mislabeled its "White Chips" and several other products in a way that would mislead consumers into believing that the products contained white chocolate. They also claim that Ghirardelli sold products as "all natural," even though (according to the plaintiffs) "they contained genetically modified, hormone-treated . . . or chemically extracted ingredients." (ECF No. 148 at 8-9; *see* ECF No. 143 at 2, ¶ 1.) Ghirardelli denies the plaintiffs' allegations. (*See, e.g.,* ECF No. 166 at 9.) The products at issue are listed in Appendix A to this order.

For more than two years, the parties conducted discovery and vied over substantive motions. Late 2013 brought them to mediation before the Honorable Edward Infante. Their first all-day session ended without resolution; but from a second effort in June 2014, and ultimately after "many rounds" of discussion, the parties crafted the settlement that they now propose. (ECF No. 148 at 9-10.)

The full settlement agreement appears at ECF No. 129-2. Its essential terms are as follows. Ghirardelli will pay $5.25 million into a common fund. The fund will be used to pay the following: all costs of notice and administration; any fees and costs awarded to Plaintiffs' counsel; any incentive award to the named Plaintiffs; and class members' claims. (ECF No. 129-2 at 11, § 3.3.) Each class member who makes a claim will obtain $1.50 per purchase of the White Chips and $0.75 per purchase of any of the other products labeled "All Natural." There will be no cap on the total amount paid to a claimant for purchases that are corroborated by a Proof of Purchase. (*Id.* at 12-13, § 3.7.) (A "Proof of Purchase" is an itemized retail sales receipt showing, at a minimum, the purchase of a Product, the purchase price, and the date and place of the purchase. (*Id.* at 9 § 2.26.)) For claims that are not corroborated by a Proof of Purchase, a maximum of $24.00 will be paid to any Household. (*Id.* at 12-13, § 3.7.) ("Household" means any number of persons occupying the same dwelling unit. *Id.* at 8, § 2.14.) Awards may be reduced *pro rata* if the total value of claims exceeds the amount of the common fund after payment of notice and

administration costs, fees, costs, and incentive awards. (*Id*. at 11, § 3.3.) If money remains in the common fund after paying all claims, incentive awards, and fees and costs, the money will be donated *cy pres*, in equal amounts*,* to four charitable organizations. (*Id*., § 3.4.) Finally, Ghirardelli has agreed to maintain for three years certain labeling changes to all the products at issue, changes that it implemented during this lawsuit. (*Id.* at 14, § 3.10.) These changes will more specifically consist of Ghirardelli's agreement:

a) not to use the phrase "all natural";

b) not to use the phrase "Classic White" with respect to the White Chips except as part of the phrase "Classic White Chips"; and

*c)* not to use the phrases "baking chocolate" or "chocolate indulgence" on the packaging for the White Chips, even in referring to other products.

(*Id.*)

The court preliminarily approved this settlement in early October 2014. (ECF No. 141.) It formed a conditional settlement class, appointed Messrs. Miller and Leyton as class representatives, named their attorneys as class counsel, and approved a class-notice plan. (ECF No. 141 at 9-11 (describing notice plan).

Three people filed objections to the settlement. (ECF Nos. 146, 153, 159.) The parties responded to the objections. (ECF Nos. 160, 164.) The Plaintiffs also moved to strike two of the objections — by Brittany Ference (ECF No. 153) and Michael Narkin (ECF No. 159) — for failure to demonstrate class membership. (ECF No. 165. ) One of the objections challenged the lawsuit essentially on the defendant's behalf, urging the court to dismiss the case entirely. (ECF No. 146.)

The court held a hearing on February 19, 2015. (*See* ECF No. 168.) No objector attended. Having considered the parties' arguments, the evidence, and the settlement itself, the court approves the settlement as follows.

///

///

///

## I. JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1132(d)(2).

## II. CLASS CERTIFICATION

For the reasons and under the law set out in the court's preliminary-approval order (ECF No. 141 at 3-6), the court holds that the proposed settlement class meets all the requirements of procedural Rules 23(a) and 23(b)(3). The settlement class is hereby formed and is defined as: All persons (other than Excluded Persons) who, between August 17, 2008 and October 2, 2014, purchased, in the United States, except for purposes of resale, any of the Products listed in Appendix A to this order.

Excluded Persons means: (1) the Honorable Laurel Beeler and any member of her immediate family; (2) the Honorable Edward Infante and any member of his immediate family; (3) any government entity; (4) any of the Released Parties; and (5) any persons who timely opted out of the Settlement Class — a complete list of whom appears as Appendix B to this order.

The court appoints plaintiffs Scott Miller and Steve Leyton as class representatives, and Gutride Safier LLP as class counsel. This, too, is for the reasons given in the preliminary-approval order. (*See* ECF No. 141 at 4-6.)

## III. NOTICE

The parties complied in all material respects with the notice plan contained in the settlement agreement and preliminarily approved by the court. The declaration of the claim administrator (The Garden City Group) confirms this. (*See* ECF No. 148-3 at 1-8.)

Following the court's preliminary approval and conditional certification of the settlement class, the claim administrator established a settlement website that contained: the settlement notices; a contact-information page that includes address and telephone numbers for the claim administrator and the parties; the settlement agreement; the signed order of preliminary approval; online and printable versions of the claim form and the opt-out forms; answers to frequently asked questions; and a list of the affected products. The motion for final approval and application for attorney's fees, costs, and incentive awards were also placed on the website. Notice was published

United States District Court
Northern District of California

United States District Court
Northern District of California

in several places, all of which referred class members to the settlement website. (Dowd Decl. – ECF No. 148-3, ¶¶ 8, 17 & Ex. A-E.) One half-page ad was published in the November 10, 2014, print version of *People* magazine. (*Id*. ¶ 5.) An additional eighth-page ad was published in the *Oakland Tribune* on October 22 and 29 and November 5 and 12, 2014. (*Id*. ¶ 6.) Online notice was published for a total of 316 million impressions on various websites, including Facebook, Yahoo! network, MSN network, and a website group that include cooking and baking websites. (*Id*. ¶ 7.) The ad also appeared more than 2 million times through an MSN mobile service. (*Id*. ¶ 9.)

The claim administrator sent direct notice to each of the approximately 21,358 settlement class members for whom Ghirardelli had names and addresses because they purchased through the Ghirardelli website or phone system. The email notice described the settlement and provided a link to the settlement website. Clicking on the link provided in the email brought class members to a pre-populated claim form with the records of their purchases and informed them that Proof of Purchase for those items had been submitted. The email notice was sent twice. In cases where Ghirardelli did not have an email address for a buyer (approximately 133 persons), or the initial email notice was returned as undeliverable (approximately 2040 persons), the claim administrator sent postcard notice by first-class mail to the settlement class member's address based on Ghirardelli's records as updated through the National Change of Address Database. (*Id*. ¶¶ 10-14.) Just over 200 postcards were returned as undeliverable, and the claims administrator undertook a more detailed search for new addresses and re-mailed 110 of the cards. (*Id*. ¶ 15.)

The court finds that this delivered absent class members the best notice practicable under the circumstances, sufficiently advised class members of this action and the terms of the proposed settlement, and informed unnamed members of their right to opt out of the class and object to the settlement. The notice plan, in short, met all legal requisites.

## IV. COMPLIANCE WITH CLASS ACTION FAIRNESS ACT

The class-notice plan has met the requirements of 28 U.S.C. § 1715. The Claims Administrator notified the appropriate state and federal officials of the settlement and filed proof of compliance with § 1715. (*See* ECF No. 139.) The notices contained the documents required by 28 U.S.C. § 1715(b)(1)-(8). (*Id.*) The claims administrator mailed the § 1715 notices on August 27, 2014,

and filed its certificate of compliance (ECF No. 139) on October 1, 2014. This final approval of the parties' settlement thus follows the § 1715 service by more than 90 days. *See* 28 U.S.C. § 1715(d).

## V. FINAL APPROVAL OF SETTLEMENT

Settlement is a strongly favored method for resolving disputes, particularly "where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *see, e.g., In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). A court may approve a proposed class-action settlement only "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The court need not ask whether the proposed settlement is ideal or the best possible; it determines only whether the settlement is fair, free of collusion, and consistent with the named plaintiffs' fiduciary obligations to the class. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). In *Hanlon*, the Ninth Circuit identified factors relevant to assessing a settlement proposal: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class-action status throughout trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceeding; (6) the experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of class members to the proposed settlement. *Id.* at 1026 (citation omitted).

"Where a settlement is the product of arms-length negotiations conducted by capable and experienced counsel, the court begins its analysis with a presumption that the settlement is fair and reasonable." *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, *13 (N.D. Cal. Apr. 22, 2010); *see, e.g., Rodriguez v. West Pub'g Corp.,* 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution . . . ."); *Nat'l Rural Telecomm. Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).

The court finds the proposed settlement fair, adequate, and reasonable under the *Hanlon* factors. The settlement itself is the product of non-collusive, arm's-length negotiations conducted by experienced counsel with the help of a private mediator. (*See* Gutride Decl. – ECF No. 148-1, ¶¶ 47-52, 55-56.)

The court has overseen this case since its beginning and has no difficulty confirming that this has been a hard-fought affair. The parties engaged in substantial discovery and litigated numerous motions. On the plaintiffs' side, for example, class counsel propounded substantial written discovery on Ghirardelli; was in the process of obtaining third-party discovery from Ghirardelli's retailers and suppliers; obtained and reviewed more than 20,000 pages of documents; and took depositions of the six 30(b)(6) witnesses that Ghirardelli designated. (*Id.* ¶¶ 30-41.)

Considering the strength of the plaintiffs' case, the risk, expense, complexity, and likely duration of further litigation — including the risk of maintaining class action status throughout the trial, to say nothing of successfully proving liability — the court finds that these factors all weigh in favor of approving the settlement. Ghirardelli has always maintained that its products were not mislabeled or misleading and denies any liability for the class members' claims. Ghirardelli asserts that had litigation proceeded, the plaintiffs would have faced an uphill battle in certifying any class — let alone a nationwide one; could not have proved that the company's labels were deceptive or violated any law; and would have failed to establish damages (specifically, Ghirardelli maintains that no premium exists for either the white chips or the All Natural products because, among other things, sales at the same price *rose* after the allegedly deceptive information on labels was changed or removed). Ghirardelli calls the settlement a "win for the class." (ECF No. 166 at 15.) The defendant writes: "This case is not and was never . . . even a $5.25 million case. Ghirardelli settled to buy peace . . . ." (*Id.*)

Absent settlement, the plaintiffs faced the real possibility of failing to certify a class or establish liability. This case presents numerous complex and novel issues, which almost certainly would have proved costly to litigate and could have easily lead to protracted appellate litigation. The settlement represents a substantial benefit to the class. A $5.25-million common fund has been established for the class's benefit, and Ghirardelli has agreed to adhere to labeling changes for three years. Taking all this into consideration, the court concludes that the settlement is "fair, free of collusion, and consistent with the named plaintiffs' fiduciary obligations to the class." *Hanlon*, 150 F.3d at 1027. The court addresses objections to the settlement below (Part X, *infra*) because they implicate (among other issues) the *cy pres* distribution and the award of attorney's

fees.

## VI.  ATTORNEY'S FEES

Class counsel requests an award of $1,575,000 in attorney's fees and $87,572.15 in costs. (*See* ECF No. 148 at 20-28.) This Part VI addresses fees; Part VII, *infra*, addresses costs.

Rule 23(h) of the Federal Rules of Civil Procedure provides: "In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fee provisions included in proposed class-action settlements must be "fundamentally fair, adequate and reasonable." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011). The court is not bound by the parties' settlement agreement as to the amount of attorneys' fees. *Id.* at 943. The Ninth Circuit has instructed district courts to review class fee awards with special rigor:

> Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs. Accordingly, fee applications must be closely scrutinized. Rubber-stamp approval, even in the absence of objections, is improper.

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (quotation omitted).

In the Ninth Circuit, the benchmark for an attorney's-fee award is 25% of the total settlement value. *See Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990). The requested fee here is 8.9% of the total settlement value.

In common-fund cases, the Ninth Circuit requires district courts to assess proposed fee awards under either the "lodestar" method or the "percentage of the fund" method. *Fischel v. Equitable Life Ass. Soc'y of the U.S.*, 307 F.3d 997, 1006 (9th Cir. 2002); *Hanlon*, 150 F.3d at 1029. This court finds that the fee request here is reasonable under both approaches.

Where the settlement involves a common fund, courts typically award attorney's fees based on a percentage of the total settlement. The Ninth Circuit has established a "benchmark" that fees should equal 25% of the settlement, although courts diverge from the benchmark based on a variety of factors, including "the results obtained, risk undertaken by counsel, complexity of the issues, length of the professional relationship, the market rate, and awards in similar cases."

*Morales v. Stevco, Inc.*, 2013 WL 1222058, at *2 (E.D. Cal. Mar. 25, 2013); *see also Six Mexican Workers*, 904 F.2d at 1311; *State of Fla. v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990); *In re Pac. Enters. Secs. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (affirming fee award of 33% of the recovery); *Morris v. Lifescan, Inc.*, 54 F. App'x 663, 664 (9th Cir. 2003) (affirming 33% fee award).

When determining the value of a settlement, courts consider both the monetary and non-monetary benefits that the settlement confers. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 972-74 (9th Cir. 2003; *Hartless v. Clorox Co.,* 273 F.R.D. 630, 645 (S.D. Cal. 2011), *aff'd*, 473 F. App'x 716 (9th Cir. 2012); *Pokorny v. Quixtar, Inc.,* 2013 WL 3790896, *1 (N.D. Cal. July 18, 2013), *appeal dismissed* (Sept. 13, 2013) ("The court may properly consider the value of injunctive relief obtained as a result of settlement in determining the appropriate fee."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18, 2013) (settlement value "includes the size of the cash distribution, the *cy pres* method of distribution, and the injunctive relief"), *appeal dismissed* (Dec. 19, 2013).

Finally, Ninth Circuit precedent requires courts to award class counsel fees based on the total benefits being made available to class members rather than the actual amount that is ultimately claimed. *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, *23 (N.D. Cal. Mar. 28, 2007 (citing *Williams v. MGM-Pathe Commc'ns Co.,* 129 F.3d 1026 (9th Cir. 1997) ("district court abused its discretion in basing attorney fee award on actual distribution to class" instead of amount being made available)).[2]

To support their request for fees, the plaintiffs have proffered the declaration of Colin Weir, whose expert testimony on the analysis of pricing differences arising from various consumer-label claims has been accepted by other courts. (ECF No. 149-3 at 13-17.) Mr. Weir opines that the changed practices required by the settlement for the next three years can be expected to eliminate various premiums associated with "white chocolate" and "all natural" labeling and save class

---

[2] To the extent that Ms. Ference's objection suggests that fees should be based on amounts claimed, that objection is therefore overruled. (*See* ECF No. 153 at 3.)

members at least at $13.46 million. (ECF No. 148-2.) The plaintiffs argue that taking into account the $5.25-million cash payment and value of the injunctive relief, the requested fee is 8.9% of the total settlement value, almost 16 percentage points below the Ninth Circuit benchmark. Ghirardelli dispute the plaintiffs' estimate of the settlement's overall value (*see* ECF No. 166 at 2) — but the court finds that the requested fee is appropriate even if Mr. Weir's estimate is deeply discounted. Even if the value of the changed practices is only half of what Mr. Weir opines, for instance, the requested fee represents 13% of the total settlement value; if the changed practices are worth only 10% of what he opines, the requested fee is less than 24% — still below the Ninth Circuit benchmark. Even if the court considers only the monetary relief of $5.25 million, the requested fee reflects 30% of that benefit; this remains consistent with awards that have been approved in similar cases: Where a common fund is under $10 million, a fee award of this amount is often held appropriate, and the court finds it appropriate here. *See Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 297-98 (N.D. Cal. 1995) (collecting cases); *see also Johnson v. Gen. Mills, Inc.*, 2013 WL 3213832, at *6 (C.D. Cal. June 17, 2013) (awarding a fee of 30% of settlement fund in food-labeling class action).

Finally, after applying the percentage method, courts typically roughly calculate the lodestar as a "cross-check to assess the reasonableness of the percentage award." *E.g., Weeks v. Kellogg Co.*, 2013 WL 6531177, *25 (C.D. Cal. Nov. 23, 2013); *see also Serrano v. Priest*, 20 Cal. 3d 25, 48-49 (1977) *Melnyk v. Robledo*, 64 Cal. App. 3d 618, 624-25 (1976); *Clejan v. Reisman*, 5 Cal. App. 3d 224, 241 (1970); *Fed-Mart Corp. v. Pell Enterprises*, 111 Cal. App. 3d 215 (1980). "The lodestar . . . is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate." *Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000). Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained and the contingent risk presented." *Id*.

Based on the detailed declarations submitted by the plaintiffs' counsel, the court finds that lodestar is approximately $1,711,710. (*See* Gutride Decl. – ECF No. 148-1, ¶ 70 (table of hours

worked by timekeeper); Safier Decl. – ECF No. 164-1, ¶ 5.) The plaintiffs' attorneys have detailed

their efforts to date extensively, and, again, the court is familiar with the hard-fought nature of this

litigation. (*See* ECF No. 148-1, ¶¶ 4-61.) The rates they have used are their 2014 rates; this is

appropriate given the deferred and contingent nature of counsel's compensation. *See LeBlanc-*

*Sternberg v. Fletcher*, 143 F.3d 748, 764 (2nd Cir. 1998) ("[C]urrent rates, rather than historical

rates, should be applied in order to compensate for the delay in payment . . . .") (citing *Missouri v.*

*Jenkins*, 491 U.S. 274, 283-84 (1989)); *In re Washington Pub. Power Supply Sys. Sec. Litig.,* 19

F.3d 1291, 1305 (9th Cir. 1994) ("The district court has discretion to compensate delay in

payment in one of two ways: (1) by applying the attorneys' current rates to all hours billed during

the course of litigation; or (2) by using the attorneys' historical rates and adding a prime rate

enhancement.").[3]

Counsels' lodestar of $1,711,710 exceeds the requested fee award of $1,575,000. Were it in

question, the court notes that other factors here, "including the quality of the representation, the

novelty and complexity of the issues, the results obtained, and the contingent risk presented"

would likely support awarding a multiplier. *Lealao*, 82 Cal. App. at 26; *see also Walsh v. Kindred*

*Healthcare*, 2013 WL 6623224, *3 (N.D. Cal. Dec. 16, 2013) (citing *Lealao* method with

approval). Thus, the court finds the fee request reasonable under both the "percentage of the fund"

approach and the lodestar cross-check.

## VII.   LITIGATION COSTS

Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses. Fed. R. Civ.

P. 23(h); *see Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (holding that attorneys may

---

[3] Plaintiff's counsel calculated their lodestar using their regular billing rates, which for the
attorneys involved range from $450 to $750 per hour. (Gutride Decl. – ECF No. 148-1, ¶ 70.)
These hourly rates are equal to market rates in San Francisco for attorneys of plaintiff's counsel's
background and experience. (*Id.*, ¶ 72); *see also Wren v. RGIS Inventory Specialists*, 2011 U.S.
Dist. LEXIS 38667 (N.D. Cal. Apr. 1, 2011) (finding as reasonable $650 per hour for a 1993
graduate); *Californians for Disability Rights v. Cal. DOT*, 2010 U.S. Dist. LEXIS 141030 (N.D.
Cal. Dec. 13, 2010) (finding as reasonable $570 per hour for a 2000 graduate, $350 per hour for a
2007 graduate, and $475 per hour for a 2005 graduate); *Suzuki v. Hitachi*, 2010 U.S. Dist. LEXIS
22908, 2010 WL 956896 *3 (N.D. Cal. March 12, 2010) (finding as reasonable rates of $650 for
partner services, $500 for associate services and $150 for paralegal services).

United States District Court
Northern District of California

recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.); *Van Vranken*, 901 F. Supp. at 299 (approving reasonable costs in class action settlement). Costs compensable under Rule 23(h) include "nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).

Here, class counsel seeks reimbursement of $87,572.15 in litigation expenses. They have provided records that document their claim. (*See* Gutride Decl. – ECF No. 148-1, ¶ 75.) The costs will be paid from the common fund and will not reduce the amounts paid to class members who made valid claims. The court therefore finds that these submissions support an award of $87,572.15 in costs.

## VIII. INCENTIVE AWARDS

The settlement would also award each named plaintiff $5000 in incentives. District courts must evaluate proposed incentive awards individually, using relevant factors that include, "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977. "Such awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-959.

The Ninth Circuit has "noted that in some cases incentive awards may be proper but [has] cautioned that awarding them should not become routine practice." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1163 (9th Cir. 2013) (discussing *Staton*, 327 F.3d at 975). The Ninth Circuit has also emphasized that district courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe*, 715 F.3d at 1164.

The incentives proposed here are within the range of such awards that the Ninth Circuit has either affirmed or cited with approval. *See In re Mego Fin. Corp. Secs. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (approving $5000 incentive to each named representative of potentially 5400-member class in settlement of $1.725 million); *In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th

Cir. 2002) (approving $2000 incentive award to five named plaintiffs; class numbered potentially more than 4 million; settlement value of $3 million) (cited in *Staton*). The purported absent class members who have objected to the proposed settlement did not include the incentive among their concerns. (*See* ECF Nos. 146, 153, 159.)

The named plaintiffs merit this incentive. Their lawyer has explained the efforts they personally made in pursuing this lawsuit. (*See* Gutride Decl. – ECF No. 148-1.) They both worked with counsel to provide declarations and other information throughout the litigation. They conducted "lengthy" searches of their personal records. They spent time preparing for and being deposed. They both responded to interrogatories and requests for production. They either attended the mediation sessions or remained available for consultation, and were consulted. According to their lawyer, both plaintiffs stayed actively involved in this case before and after the settlement. (*See id.* at 12, ¶¶ 65-66.) In principle, too, and though the risk may have been small, the plaintiffs did take on the risk of potentially bearing Ghirardelli's costs in a losing effort.

## IX.     *CY PRES* AWARD

The settlement agreement provides that if, after payment of notice, administration, fees, costs, incentives and valid claims, there remains a balance in the common fund, the plaintiffs will ask the court to approve a list of charitable organizations to receive any balance remaining in the settlement fund. The parties have selected the following organizations: Consumers Union, Yonkers, NY; National Consumer Law Center, Washington, DC; University of California, Davis, Food Science & Technology Department; and Florida State University, Food & Nutrition Science Department. The parties argue that these entities are reasonably connected to this litigation, in that they work on advancing the rights of consumers and the information available to food consumers.

The *cy pres* doctrine is appropriate for a case like this one, where class members who did not make claims cannot be easily located or identified, in order to "put the unclaimed fund to its next best compensation use, *e.g.,* for the aggregate, indirect, prospective benefit of the class." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011) (citing *Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423, 436 (2d Cir.2007)). A *cy pres* remedy must "bear[] a substantial nexus to the interests of class members." *Lane v. Facebook*, 696 F.3d 811, 821 (9th Cir. 2012) *cert. denied,*

134 S. Ct. 8 (2013). In evaluating the *cy pres* component of a class settlement, courts look to factors set forth in *Six Mexican Workers*, 904 F.2d at 1305. Specifically, the *cy pres* remedy "must account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members . . . ." *Nachshin*, 663 F.3d at 1036 (citing *Six Mexican Workers,* 904 F.2d at 1307).

The *cy pres* plan in this case would distribute equal sums to the following organizations:

**Consumers Union** (Yonkers, NY). Consumers Union is a non-profit organization with a mission "to work for a fair, just and safe marketplace for all consumers and to empower consumers to protect themselves." (Gutride Decl. – ECF No. 148-1, ¶ 79.) It publishes *Consumer Reports* magazine and website (www.consumerreports.org), as well as *The Consumerist Blog* (www.consumerist.com), both of which provide information of interest to consumers, such as product reviews and information about false-advertising scams. Consumers Union is also active in educating consumers about food labeling. It operates the website Not In My Food (www.notinmyfood.org), which provides information to consumers about the presence of genetically modified organisms (GMOs) and other controversial ingredients in food. It also lobbies for better food-labeling laws. In October 2014, Consumer Union published an article in *Consumers Reports* entitled, "GMOs and Food: Do you know what you're eating?" (*See* http://www.consumerreports.org/cro/news/2014/10/gmos-and-food-do-you-know-what-you-are-eating/index.htm, last accessed December 20, 2014.) Consumers Union has been approved as a *cy pres* recipient in numerous false-advertising lawsuits. *See, e.g. Nigh v. Humphreys Pharmacal, Inc.*, 2013 WL 5995382, *9 (S.D. Cal. Oct. 23, 2013) ("the Court finds that this *cy pres* distribution to Consumers Union reflects the objectives of the UCL and CLRA; reflects the interests of silent Class Members; and benefits the Plaintiff Class, who are consumers that purchased Products based on false and misleading representations"); *Dennis v. Kellogg Co.*, 2013 WL 6055326, *1 (S.D. Cal. Nov. 14, 2013), *appeal dismissed* (May 15, 2014) (approving Consumers Union as a *cy pres* recipient in food-labeling class action).

**National Consumer Law Center** (Washington, DC). The National Consumer Law Center (NCLC) advocates on behalf of consumers, providing legal services and aid, and representing

them on matters of interest before Congress and state legislatures and by filing amicus briefs in courts. (Gutride Decl. – ECF No. 148-1, ¶ 80.) In 2009, it published "Consumer Protection in the States: A 50-State Report on Unfair and Deceptive Acts and Practices Statutes," which analyzed and summarized the unfair-and-deceptive-acts-and-practices (UDAP) laws that protect consumers in each state and the District of Columbia, spotlighted limitations in these laws and in their enforcement, and made proposals for reform. It also provides help to litigation counsel representing persons with incomes below 200% of the federal poverty line in matters involving consumer sales and services. NCLC has been approved as a *cy pres* recipient in other consumer class actions, including recent food-labeling cases. *See, e.g., Johnson*, 2013 WL 3213832, at *1 (N.D. Cal.); *Custom LED, LLC v. eBay, Inc*, 2014 WL 2916871, *10 (N.D. Cal. June 24, 2014).

**University of California, Davis – Food Science & Technology Department.** The Food Science & Technology Department of UC Davis is an internationally recognized program that researches food safety and quality. Its scientists work on food chemistry, food processing, and food microbiology. It also operates the August A. Busch III Brewing and Food Science Laboratory, where research is performed into issues relating to the processing of many fruits, dairy, and beverage products. For example, the department has conducted studies into the presence of GMOs and hormones in food. UC Davis is part of the publicly funded University of California system. (Gutride Decl. – ECF No. 148-1, ¶ 81.)

**Florida State University – Nutrition, Food & Exercise Science Department**. Florida State University's Department of Nutrition, Food and Exercise Sciences offers undergraduate and graduate degrees in Dietetics and Food & Nutrition and conducts research in human nutrition and food science, as well as sports nutrition, sports sciences, and exercise physiology. The department facilitates integrative studies on diet and physical activity in the maintenance of health and the prevention and treatment of selected chronic disease states, as well as studies on the quality and safety of food and on optimal human performance. The department's Nutrition and Food Instrument Laboratory provides a setting for chemical, analytical, and microbiology testing. Florida State University is publicly funded. (*Id.*, ¶ 82.)

There is the required geographic nexus between these organizations and the nationwide class.

*See Nachshin*, 663 F.3d at 1039-40 (*cy pres* award in nationwide class suit must serve "geographically diverse" area). The organizations were chosen to meet the legal needs of consumers nationwide. All four organizations serve consumers nationally. The University of California and Florida State University were chosen because of their geographic diversity and impact, which will benefit class members nationwide. *Cf. In re EasySaver Rewards Litig.*, 921 F. Supp. 2d 1040, 1052 (S.D. Cal. 2013) (finding that donations to Los Angeles-based organizations for the creation of educational materials will benefit a nationwide class because "the internet is not limited by geographic boundaries, and the educational impact of the funded academic programs will have a nation-wide impact").

## X. OBJECTIONS TO THE SETTLEMENT

### A. Preliminary Questions: The Objectors Lack Standing

The first objector, Carol Dierkes, urges the court to "dismiss" the case as "frivolous" because no physical injury befell plaintiffs. (ECF No. 146.) Physical injury is not required where the harm complained of is economic. *See, e.g., Kosta v. Del Monte Corp.*, 2013 WL 2147413, *11-12 (N.D. Cal. May 15, 2013) ("Plaintiffs allege that Del Monte has created misleading labeling and advertising . . . that . . . caused them to purchase products or pay premiums they would not have otherwise."). Because Ms. Dierkes does not complain about the terms of the settlement itself, there is nothing more in her objection for the court to consider.

The plaintiffs have asked the court to strike the remaining two objections, those by Michael Narkin (ECF No. 159; in *pro per*) and Brittany Ference (ECF No. 153; represented by Matthew Kurlich). The plaintiffs argue that Mr. Narkin and Ms. Ference have not complied with the stated procedures for establishing membership in the class. In the preliminary approval order, which was posted on the Settlement Website, this court ordered:

> Each such objection must include the following: (1) the name, address, and telephone number of the Settlement Class Member; (2) documents or testimony sufficient to establish membership in the Settlement Class; and (3) a detailed statement of any objection asserted, including the grounds therefor and reasons, if any, and for requesting the opportunity to appear and be heard at the fairness hearing. Failure to include the foregoing information will constitute grounds for striking an objection.

(ECF No. 141, at 14.) The court finds that, in fact, all three objectors have failed to establish their standing to challenge the settlement. Ms. Ference and Mr. Narkin have not complied with these procedures and so have not established that they are class members. Ms. Ference did not provide her address, nor did she provide any documents or testimony to establish that she is a class member. Nothing in her objection states that she bought any Ghirardelli products.[4] Nothing in Ms. Diereke's short letter states that she bought a Ghirardelli product. (ECF No.146.) While Mr. Narkin, a former California-licensed attorney, did state, "I declare that I purchased, in the United States, at least one of the covered Ghirardelli products during the class period," he does not identify which product he bought, or when, nor does he make the statement under penalty of perjury, so it does not constitute "testimony." *See* Fed. R. Evid. 603 (requiring oath or affirmation); 28 U.S.C. § 1746 (allowing substitute testimony by declaration under penalty of perjury). It is therefore proper for the court to strike their objections. *See, e.g., In re Hydroxycut Mktg. & Sales Practices Litig*., 2013 WL 5275618, at *2 (S.D. Cal. Sept.17, 2013) (striking objection because objector had not "carried his burden of proving standing as a class member"); *In re Korean Air Lines Co. Antitrust Litig.*, 2013 WL 7985367, at *2 (C.D. Cal. Dec. 23, 2013) (finding objectors lack standing for failure to show class membership); *Kent v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 106825 *7 (N.D. Cal. Sept. 20, 2011) ("Because they are not members of the class, the Ziegenfelders lack standing to object."); *San Francisco NAACP v. San Francisco Unified School Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) ("nonclass members have no standing to object to the settlement of a class action"); *Tarlecki v. Bebe Stores, Inc.*, 2009 U.S. Dist. LEXIS 102531 (N.D. Cal. Nov. 3, 2009) ("Since she is not a class member, she has no standing to object to the settlement."); *Glass v. UBS Fin. Servs., Inc.*, 2007 U.S. Dist. LEXIS 8476, 2007 WL 221862, at *8 (N.D. Cal. Jan. 26, 2007) (same); *see also Feder v. Elec. Data Sys. Corp.*, 248 Fed. Appx. 579 *2 (5th Cir. 2007) (objectors have burden of proving standing;

---

[4] Her attorney has provided this type of information in support of other objections. *See, e.g., Roos, et al. v. Honeywell International, Inc*., CGC-04-436205 (S.F. Superior Court), available at file:///Documents/Plaintiffs%20Response%20to%20Objections%20(00042458-3).PDF; *Stanley Nader v. Capital One Bank USA, N.A. et al*, Case No., 2:12-cv-01265-DSF (C.D. Cal) Dkt.# 160, filed Sept. 2, 2014).

United States District Court
Northern District of California

"unsupported assertions of class membership" do not suffice).

The court therefore finds that all three objectors lack standing and strikes their objections.

### B. The Objections Lack Merit

Even if the objectors had proven their membership in the class, the challenges they raise do not persuade the court that the settlement should not be approved as "fair, adequate, and reasonable." Their objections touch on three topics.

#### 1. Collusion

First, both objectors refer to perceived collusion, but this court finds no evidence of collusion. Ms. Ference's objection about collusion is too unspecific to impugn the settlement. Mr. Narkin contends that the entry of the protective order governing confidential documents indicates unfairness and collusion and deprives him of his purported right as a class member to view all the documents submitted in the litigation. (ECF No. 159 at 1-3.) There is no evidence that Mr. Narkin has ever asked to see any particular document. And objectors do not have an unfettered right to discovery. *See In re Wachovia Corp. Pick-A-Payment Mortgage Mktg. & Sales Practices Litig.*, 2011 WL 1496342, *1 (N.D. Cal. Apr. 20, 2011) ("While objectors are entitled to meaningful participation in the settlement proceedings, and leave to be heard, they are not automatically entitled to discovery or to question and debate every provision of the proposed compromise."). The court finds no indication of collusion anywhere in this lawsuit and cannot accept these objections.

#### 2. Cy pres *distribution*

Ms. Ference and Mr. Narkin raise several objections to the *cy pres* distributions, but they are not well taken. For example, Ms. Ference objects that *cy pres* is inappropriate because the remainder could instead be distributed as a "pro-rata increase" to class members who made claims. No authority is provided for the argument, which would not only give claimants a windfall (perhaps entitling them to refunds exceeding their purchase price), but would also disadvantage the large majority of the class members who did not make claims. Instead, the *cy pres* awards ensure that non-claiming class members also receive benefits through the services provided by the named organizations, such as advocacy, enforcement, representation, information, education and

research. *See Hayes v. Arthur Young & Co.*, 1994 WL 463493, at *17 (9th Cir. 1994)

("Distributing the unclaimed funds pro rata would thus give the claiming class members a windfall

. . . . Thus, any excess unclaimed damages should not be distributed among the claiming

plaintiffs."); *In re EasySaver Rewards Litig.*, 921 F. Supp. 2d 1040, 1053 (S.D. Cal. 2013)

(approving *cy pres* award because absent class members would not benefit from further

distribution to claimants).

Ms. Ference next argues that the *cy pres* payments might reduce Ghirardelli's preexisting

charitable contributions or obligations. Ghirardelli has stated that it has not donated money to

these organizations in recent years. (Isip Decl. – ECF No. 161 at 2-3, ¶ 5.) And Ms. Ference's

argument does not logically apply to a non-reverting common-fund settlement, where no one

knows at the outset how much money might be left unclaimed. Furthermore, this court is unaware

of any authority that suggests that a defendant's preexisting charitable contributions should be a

factor in analyzing a *cy pres* portion of a common-fund settlement.

Finally, Mr. Narkin contends, without explanation, that the *cy pres* provision is inappropriate,

because the charities that would receive the money were not injured, and the *cy pres* distribution

"may violate the rule against perpetuities." The court finds these objections unconvincing.

### 3. *Attorney's fees*

Mr. Narkin and Ms. Ference object to the proposed fee award. First, Mr. Narkin objects that

"the amount of the proposed attorney fees of up to $1,575,000 constitutes over reaching [*sic*] and

represents unjust enrichment." (ECF No. 159 at 1.) He offers no further explanation or analysis.

Such "[c]onclusory and unsubstantiated objections are not sufficient to warrant a reduction in

fees." *Lucas v. White*, 63 F. Supp. 2d 1046, 1057 (N.D. Cal.1999) (holding that "The party

opposing the fee application has a burden of rebuttal that requires submission of evidence to the

district court challenging the accuracy and reasonableness of the hours charged or the facts

asserted by the prevailing party in its submitted affidavits."); *accord In re Toyota Unintended

Acceleration*, 2013 WL 8541175 (C.D. Cal. July 24, 2013) (rejecting unsupported objections to a

proposed fee award); *EnPalm, LLC v. Teitler,* 162 Cal.App.4th 770, 775 (2008) (same).[5]

Ms. Ference makes two comments on the value of the changed labeling practices. First, she claims that the labeling changes have no value because they will only be maintained for three years. The court finds that three years is significant. As Ghirardelli asserts, there is currently a lack of regulatory guidance as to the definition of the term "all natural," and Ghirardelli is bound to keep the label changes in place for the next three years regardless of changes in the regulatory environment during that time — even if those regulatory changes make clear that Ghirardelli's use of the term was correct. (ECF No. 149-3, ¶¶3, 13.)

Ms. Ference then claims that, if after three years Ghirardelli reverts to the old packaging, class members will have released claims for subsequent purchases. That argument evinces a misunderstanding of the law and the terms of the release, as there is no release of claims about future conduct or injuries that have not yet occurred. *See Ball v. Johanns*, 2007 WL 3124962, at *4 (E.D. Cal. Oct. 24, 2007) (full release under Civil Code section 1542 did not bar claims based on subsequent injury, as statute "relates only to those claims that 'exist ... at the time of executing the release'"). Instead, the settlement agreement expressly releases only claims that actually were, or could have been, asserted in this lawsuit. (ECF No. 129-2, § 8.2.) Accordingly, the objections are overruled.

## XI.    RELEASES AND EFFECT OF THIS ORDER

By operation of this Final Approval Order and entry of judgment, Plaintiffs on the one hand, and the Released Parties[6] on the other hand, shall have unconditionally, completely, and irrevocably released and forever discharged each other from and shall be forever barred from instituting, maintaining, or prosecuting:

---

[5] Mr. Narkin has made the same, identically phrased objection in the past, where it was also overruled. *Arnold v. Fitflop USA, LLC,* 2014 WL 1670133, *8 (S.D. Cal. Apr. 28, 2014) (finding "claim of an indicia of a consciousness of unfairness and collusion" without merit), *appeal dismissed* (Oct. 20, 2014).

[6] "Released Parties" means Defendant and its present and former subsidiaries, parents, affiliates, divisions, officers, directors, members, managers, shareholders, insurers, suppliers (including, but not limited to, Kerry, Inc.), manufacturers, re-sellers, distributors, brokers, service providers, employees, agents, legal representatives, heirs, predecessors, successors, or assigns.

1) any and all claims, liens, demands, actions, causes of action, obligations, damages or liabilities of any nature whatsoever, whether legal or equitable or otherwise, known or unknown, that actually were, or could have been, asserted in this litigation, based upon any violation of any state or federal statutory or common law or regulation, and any claim arising directly or indirectly out of, or in any way relating to, the claims that actually were, or could have been, asserted in this litigation, that Plaintiffs on the one hand, and Defendant on the other hand, have had in the past, or now have, related in any manner to the Released Parties' products, services or business affairs; and

2) any and all other claims, liens, demands, actions, causes of action, obligations, damages or liabilities of any nature whatsoever, whether legal or equitable or otherwise, known or unknown, that Plaintiffs on the one hand, and Defendant on the other hand, have had in the past or now have, related in any manner to any and all Released Parties' products, services or business affairs, or otherwise.

By operation of this Final Approval Order and entry of judgment, Settlement Class Members shall have unconditionally, completely, and irrevocably released and discharged the Released Parties from any and all claims, rights, demands, actions, causes of action, suits, debts, liens, contracts, liabilities, agreements, costs, expenses, or losses of any kind whatsoever, including any known or unknown claims, which actually were, or could have been, asserted in the Litigation or that relate to: (1) the Romance Language; (2) allegations that the names Ghirardelli has used for its White Chips, including "Premium Baking Chips- Classic White" and "Classic White Chips" are confusing or misleading, or violate any FDA regulations or applicable laws; (3) allegations that the White Chips are marketed in a manner that suggests or indicates that they are white chocolate or chocolate, or that the White Chips contain white chocolate, chocolate, or cocoa butter; (4) inaccuracies in the ingredient list on the White Chips labels; (5) allegations that the Products contain ingredients that are not "natural" or "all natural" or that that Products themselves are not "natural" or "all natural;" or (6) allegations that the manufacturing process used in the Products or ingredients for the Products renders the Products not "natural" or not "all natural."

///

Plaintiffs and Settlement Class Members shall, by operation of this Final Approval Order and entry of judgment, be deemed to have waived the provisions, rights and benefits of California Civil Code § 1542, and any similar law of any state or territory of the United States or principle of common law. Section 1542 provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Nothing herein shall bar any action or claim to enforce the terms of the Settlement Agreement.

No action taken by the Parties, either previously or in connection with the negotiations or proceedings connected with the Settlement Agreement, shall be deemed or construed to be an admission of the truth or falsity of any claims or defenses heretofore made or an acknowledgment or admission by any Party of any fault, liability or wrongdoing of any kind whatsoever to any other Party. Neither the Settlement Agreement nor any act performed or document executed pursuant to or in furtherance of the Settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any claim made by the Settlement Class Members or Class Counsel, or of any wrongdoing or liability of the persons or entities released under this Order and the Settlement Agreement, or (b) is or may be deemed to be, or may be used as an admission of, or evidence of, any fault or omission of any of the persons or entities released under this Order and the Settlement Agreement, in any proceeding in any court, administrative agency, or other tribunal. Defendant's agreement not to oppose the entry of this Final Approval Order shall not be construed as an admission or concession by Defendant that class certification was appropriate in the Litigation or would be appropriate in any other action.

Except as provided in this Order, Plaintiffs shall take nothing against Defendant by their Complaint. This lawsuit is hereby dismissed on the merits and with prejudice and final judgment shall be entered thereon, as set forth in this Order.

Without affecting the finality of the judgment hereby entered, the Court reserves jurisdiction over the implementation of the Settlement Agreement.

**CONCLUSION**

The court hereby confirms its provisional appointments of class representatives and class counsel as reflected in its preliminary approval order, grants final approval of the settlement and directs the parties and the claim administrator to comply with the terms of the settlement and to distribute the common fund as reflected in the settlement and this order.

This disposes of ECF No. 148.

**IT IS SO ORDERED**.

Dated: February 20, 2015

LAUREL BEELER
United States Magistrate Judge

# APPENDIX A - List of Products

The following products are covered by this settlement:

| PRODUCT | TYPE | SIZE |
|---|---|---|
| Gourmet 100% Unsweetened Baking Chocolate Chips | Chips | 10 oz |
| Gourmet 58% Semisweet Chocolate for Baking Chips | Chips | 10 oz |
| Gourmet 72% Extra Bittersweet Baking Chocolate Chips | Chips | 10 oz |
| Gourmet Milk 32% Creamy Devotion | Bag | 5.25 oz; 6 oz |
| Gourmet Milk 32% Creamy Devotion | Bar | 3.5 oz |
| Gourmet Milk 32% Creamy Devotion | Square | Bulk |
| Gourmet Milk 32% Creamy Devotion | Square | Bulk |
| Gourmet Milk Assorted | Bar | Mixed (72 ct) |
| Gourmet Milk Sea Salt & Almonds | Bar | 3.5 oz |
| Gourmet Milk Sea Salt Escape | Bag | 4.5 oz; 5.25 oz |
| Gourmet Milk Toasted Coconut | Bar | 3.5 oz |
| Intense Dark Assorted | Bag | 6.38 oz; 4.5 oz; 19.14 oz; 15.01 oz |
| Intense Dark Cabernet Matinee | Bar | 3.5 oz |
| Intense Dark Cherry Tango | Bar | 3.5 oz |
| Intense Dark Espresso Escape | Bag | 4.87 oz |
| Intense Dark Espresso Escape | Bar | 3.5 oz |
| Intense Dark Evening Dream 60% | Bar | 3.5 oz |
| Intense Dark Evening Dream 60% | Squares | Bulk |
| Intense Dark Hazelnut Heaven | Bar | 3.5 oz |
| Intense Dark Holiday Assorted | Bag | 7.13 oz |
| Intense Dark Midnight Reverie 86% | Bag | 4.12 oz; 4.87 oz |
| Intense Dark Midnight Reverie 86% | Bar | 3.17 oz |
| Intense Dark Midnight Reverie 86% | Squares | Bulk |
| Intense Dark Mint Bliss | Bag | 4.87 oz |
| Intense Dark Mint Bliss | Bar | 3.5 oz |
| Intense Dark Sea Salt Soiree | Bag | 4.12 oz; 4.87 oz |
| Intense Dark Sea Salt Soiree | Bar | 3.5 oz |
| Intense Dark Sea Salt Soiree | Squares | Bulk |
| Intense Dark Toffee Interlude | Bar | 3.5 oz |
| Intense Dark Twilight Citrus Sunset | Bar | 3.5 oz |
| Intense Dark Twilight Delight 72% | Bag | 4.87 oz; 5.62 oz |
| Intense Dark Twilight Delight 72% | Bar | 3.5 oz |
| Intense Dark Twilight Delight 72% | Squares | Bulk |

| PRODUCT | TYPE | SIZE |
|---|---|---|
| Intense Dark Valentines Assorted | Bag | 7.13 oz; 4.5 oz |
| Luxe Milk | Bag | 5.25 oz |
| Luxe Milk | Bar | 3 oz; 3.5 oz |
| Luxe Milk | Squares | Bulk |
| Luxe Milk Almond | Bag | 4.75 oz |
| Luxe Milk Almond | Bar | 3 oz; 3.5 oz |
| Luxe Milk Almond | Squares | Bulk |
| Luxe Milk Assorted | Bag | 22.38 oz; 8.11 oz; 8.28 oz |
| Luxe Milk Crisp | Bag | 4.69 oz |
| Luxe Milk Crisp | Bar | 2.81 oz |
| Luxe Milk Crisp | Squares | Bulk |
| Luxe Milk Dark Duet | Bar | 3 oz |
| Luxe Milk Hazelnut | Bag | 4.75 oz |
| Luxe Milk Hazelnut | Bar | 3 oz |
| Luxe Milk Hazelnut | Squares | Bulk |
| Luxe Milk Holiday Assorted | Bag | 8.44 oz |
| Luxe Milk Holiday Assorted (Premium) | Bag | 8.64 oz; 9.64 oz; 10.64 oz |
| Luxe Milk Toffee | Bar | 3 oz; 3.5 oz |
| Luxe Milk Valentine's Heart | Squares | 6.17 oz; 8.28 oz ; Mixed 6.1 oz |
| Luxe Milk Valentines Assorted | Bag | 8.44 oz |
| Luxe Milk Valentines Assorted (Premium) | Bag | 8.64 oz |
| Premium Baking Bar - 100% Cacao Unsweetened | Bar | 4 oz |
| Premium Baking Bar - 60% Cacao Bittersweet Chocolate | Bar | 4 oz |
| Premium Baking Bar - 70% Cacao Extra Bittersweet Baking Bar | Bar | 4 oz |
| Premium Baking Bar - Milk Chocolate | Bar | 4 oz |
| Premium Baking Bar - Semi Sweet Chocolate | Bar | 4 oz |
| Premium Baking Bar - White Chocolate | Bar | 4 oz |
| Premium Baking Chips - 60% Cacao | Chips | 11.5 oz; 8.8 oz; 11 oz; 10 oz |
| Premium Baking Chips - 60% Cacao Bittersweet Chocolate | Chips | 3.5 lb; 3.0 lb; 30 oz |
| Premium Baking Chips - Classic White | Chips | 11 oz |
| Premium Baking Chips - Classic White Chips | Chips | 11 oz |
| Premium Baking Chips - Double Chocolate Bittersweet Chips | Chips | 3.0 lb; 3.5 lb |
| Premium Baking Chips - Milk Chocolate | Chips | 32 oz; 11.5 oz |

| PRODUCT | TYPE | SIZE |
| --- | --- | --- |
| Premium Baking Chips - Semi Sweet Chocolate | Chips | 36 oz; 12 oz; 11.5 oz; 10 oz |
| Premium Baking Chips – Semi Sweet Mini | Mini chips | 10 oz |
| Premium Baking Cocoa - Sweet Ground Chocolate | | 16 oz |
| Premium Baking Cocoa - Unsweetened Cocoa | | 10 oz |
| Sublime White Cookies Jubilee | Bar | 3.17 oz |
| Sublime White Vanilla Dream | Bag | 4.12 oz |
| Sublime White Vanilla Dream | Bar | 3.17 oz |
| Sublime White Vanilla Dream | Squares | Bulk |

United States District Court
Northern District of California

# APPENDIX B

# Requests for Exclusion Received Timely as of February 18, 2015

| # | Name | City | State | GCG ID# |
|---|------|------|-------|---------|
| 1 | Ada Diane Rico | Chicago | IL | L01044741 |
| 2 | Adam Roberts | Indianapolis | IN | Y32682D678 |
| 3 | Alex Morrow | Fresno | CA | YEE195C746 |
| 4 | Amy K. Lawther | Manchester | MI | L01002353 |
| 5 | Andrea Bunch | Roseville | CA | L01003424 |
| 6 | Anne B. Young | Arroyo Grande | CA | L01008957 |
| 7 | Ashley Holland | Olive Branch | MS | Y813393180 |
| 8 | Belinda Willis | Forrest City | AR | YC4DE8EE4E |
| 9 | Brandy Spry | Yakima | WA | 771E1027AF |
| 10 | Cheryl A. Borrelli | Trappe | PA | L01020765 |
| 11 | Christine Sellard | Denver | CO | 2988570F2D |
| 12 | Dale W. Johnson | Edinboro | PA | L01033652 |
| 13 | David Henry Shanken | Millsboro | DE | Y99153A05C |
| 14 | Freder Lockett | Schererville | IN | Y9B6FE82D2 |
| 15 | Gregory Andrews | Belfry | KY | Y02C7A51E0 |
| 16 | Henry Padilla | San Tan Vly | AZ | L01003000 |
| 17 | Isaac C. Sparks | Reisterstown | MD | Y9F6940DB1 |
| 18 | Janice Lovekamp | Jackson | MO | Y8805AAFCC |
| 19 | Jason Pampena | Pittsburgh | PA | Y0C609E053 |

| 20 | Jerald Wesley Depew | Levittown | PA | Y30325D129 |
|---|---|---|---|---|
| 21 | John Seales | Ponca City | OK | L01001150 |
| 22 | Jose Aguirre | Loveland | CO | Y0DD88BA90 |
| 23 | Joseph Christopher Pianta | Erie | PA | YC461E62FF |
| 24 | Joseph P. Best | Nashville | IN | Y561C111D4 |
| 25 | Justin Silverman | Johns Island | SC | L01035063 |
| 26 | Kallyne Jeffries | Albany | NY | YA6CDACFCF |
| 27 | Katie McGuire | Palm Bay | FL | Y60D76EE97 |
| 28 | Kevin Beck | Broken Arrow | OK | L01024888 |
| 29 | Lakeitha Bradshaw-Macias | Suisun City | CA | Y2F10D0D33 |
| 30 | Landy Willis | Madison Ark | AR | YC2EC6271D |
| 31 | Larry Hodges | Forrest City | AR | Y3E6C7228D |
| 32 | Linda Eller | Reno | NV | YFE1280E5A |
| 33 | Lisa M. Lacey | Euclid | OH | Y0D9E214A1 |
| 34 | Lisa McDonald | Independence | MO | L01012253 |
| 35 | Loren Jones | Snohomish | WA | YC567915BC |
| 36 | Marc Sidoti | Temperance | MI | YCBEAD423D |
| 37 | Marcella Ray | Charlotte | NC | Y6823FD4A4 |
| 38 | Mary Wadulack Rodriguez | Clermont | FL | 2B375E984D |
| 39 | Michelle Patterson | Los Angeles | CA | Y8E4CE7C56 |
| 40 | Mikhail Nesterovich | Elizabeth | NJ | L01002595 |
| 41 | Norton Richards | Pine Ridge | SD | Y8AE0050AA |
| 42 | Philip Buonadonna | San Francisco | CA | L01014591 |
| 43 | Porcia Hopkins | Southaven | MS | YB3F834200 |
| 44 | Robyn Darbyshire | Beaverton | OR | L01028872 |
| 45 | Sandra Chidester | Baden | PA | Y99F3C153F |
| 46 | Sara James | Manhattan Beach | CA | Y5D4CFEF0D |
| 47 | Shawn Bowersock | Des Moines | IA | YA46EA92AE |

United States District Court
Northern District of California

| 48 | Sheila Byrns | Laredo | TX | YBEACA1435 |
|----|--------------|--------|----|------------|
| 49 | Suzanne Mackillop | Hemet | CA | Y3E18B44E1 |